UNITED STATES, Appellant

v.

JEFFERSON D. COATES, Fireman Apprentice,
U. S. Navy, Appellee

2 USCMA 625, 10 CMR 123

No. 1637
Decided June 12, 1953

CDR Robert F. Milota, USN, for Appellant.
CDR Francis X. Driscoll, USN, for Appellee.

## Opinion of the Court

PAUL W. BROSMAN, Judge:

A Navy court-martial has convicted the accused under two specifications of desertion with intent to remain away permanently and one charge of escape from confinement, the former in violation of the Uniform Code of Military Justice, Article 85, 50 USC § 679, the latter proscribed by Article 95, 50 USC § 689. The findings and the sentence were approved by the convening authority, but a board of review, in its consideration of the case, and for reasons which will appear shortly, held the second of the two alleged desertions, and the escape from confinement charged, not proved by competent evidence. It, therefore, set aside the two convictions and reduced the period of confinement imposed. Thereupon, The Judge Advocate General, United States Navy, certified the following question to this Court:

"Is Prosecution Exhibit 2, which was prepared by the Assistant Officer in Charge, U. S. Navy Recruiting Station, Columbia, South Carolina, admissible as an official record of the facts therein recited?"

II

A chronological account of underlying facts is required to place this inquiry in a background necessary to its understanding. The accused, it was alleged, absented himself without authority from his duty station at the United States Naval Base, Charleston, South Carolina, on January 9, 1952. Prosecution Exhibit 2 recited the following facts in substance. Accused was apprehended by civilian authorities at Laurens, South Carolina, April 9, 1952. At that time he was dressed in civilian clothes. On April 11 he was surrendered to military control at Donaldson Air Force Base, Greenville, South Carolina, and placed in the station hospital there under guard. Later during the same day, he escaped through a window of his hospital quarters. Three days thereafter, on April 14, he was apprehended once more by civilian police and surrendered a second time to authorities at Donaldson Air Force Base. On April 16 he was delivered to the United States Navy Recruiting Substation, Greenville, South Carolina. Thence he was transferred to the Recruiting Station at Columbia, South Carolina, and, from there to the Receiving Station, Charleston, South Carolina.

The Board of Review recited that, to qualify as an exception to the hearsay rule under paragraph 144b, Manual for Courts-Martial, United States, 1951, an official record "must be one made by a person who has an official duty to make such a record and is required to know or to ascertain through customary and trustworthy channels of information the truth of the facts or events so recorded." Thereafter, relying on the opinion of this Court in United States .v. Masusock (No. 15), 1 USCMA 32, 1 CMR 32, decided November 9, 1951, its members concluded that the entries reflected in Prosecution Exhibit 2 related above, and made by the Assistant Officer in Charge, United States Navy Recruiting Station, Columbia, South Carolina, were not within the "official records" exception, because they related to "events alleged to have occurred at the Air Force Base [and] were not based upon information obtained from *official unit sources* within the command to which the officer making such entries was attached."

III

As we see the problem, there are two fundamental errors in the opinion of the board. First, it ignores the provisions of Article C–7804, BuPers Manual, which is assigned in the heading of Exhibit 2 as the directive demanding the information therein reported, and as-

**627**

sumes that the officer who made the report, which is at the foundation of Exhibit 2, had no duty to record the information he secured and set down. On examination of paragraph (3) of that Article, governing reports required from "Commands to Which Surrendering Absentees Are Not Attached"—applicable under the facts of this case—we find that the commanding officer of the ship or station to which an absentee surrenders, or is delivered, is required to provide entries on page 13 of the offender's service record dealing with eight different matters therein specified, the first of which is:

"(a) Circumstances of return, whether surrendered or delivered."

Prosecution Exhibit 2 contains all of the information demanded by this Article of the BuPers Manual. The entry directly attacked here, relating to the initial apprehension and subsequent escape by the accused, was recorded in response to "(a)" quoted immediately above. Our next inquiry must then be concerned with whether that information was *required* by "(a)." Obviously, the terms of this particular subparagraph are quite broad. Literally, it certainly asks for more complete information than would be contained in a simple statement that the accused surrendered, or that he was apprehended. We are sure that its very latitude justifies— even compels—a broad construction. Taking into account the palpable fact that its application by officers without professional legal training was contemplated—that is, that it must have been recognized that its provisions would be administered by persons unaccustomed to the taking of technical distinctions— we must construe it to *demand* a report of any and all events attendant upon the return of a Naval absentee to Naval custody which could *reasonably* have been regarded as "Circumstances of return." Applying this view to the facts of the instant case, we have no doubt that all of the matters related in Prosecution Exhibit 2—including the initial apprehension and subsequent escape of the accused—were properly considered by the officer concerned to have fallen within the phrase "Circumstances of return" of the accused to Naval custody.

**628**

Accordingly, the entry was made pursuant to a duty on the part of the official who made it; and, as a part of the official duty of that officer, he was required to ascertain from reliable informational sources the correctness of the matters he recorded. The requirements of the official record exception were, therefore, satisfied. See United States v. Masusock, supra.

In this connection we should perhaps make plain that we are not unaware of the line of prior military decisions to the effect that morning report extract copies are not admissible in evidence to establish that an accused was *apprehended*. See ACM 3038, Spradlin, 3 CMR(AF) 692; ACM 3180, Nall, 3 CMR(AF) 736; United States v. Sulecki, 6 BR–JC 97. However, the distinction between those cases and the present one is plain. We are not here concerned with an extract copy of a morning report entry, but rather are dealing with entries required by regulations to be made in the service record of absentees when they surrender, or are delivered, to a Naval command other than that to which they are attached. The opinions in the cited cases make it perfectly clear that *their* ratio in excluding morning report records of apprehension is that, under applicable regulations, the officer preparing the morning report was *not* under a duty to ascertain and to record whether the offender had been apprehended. Here, however, as we have expressly recognized, the reporting officer *was*—under applicable regulations—required to ascertain and to record the "Circumstances of [the] return," which, in the view we take, demands a report of whether the absentee was apprehended, together with other relevant facts.

IV

The second fallacy in the board's opinion lies in its criticism of the source of the information contained in Prosecution Exhibit 2 relative to events which occurred at Donaldson Air Force Base. We cannot be certain that we have discerned the precise ratio of the board's decision in this connection, but it appears to be bipartite in character—with

both branches, perhaps, not entirely separate. On the one hand, the board seems to have been troubled by the fact that a Naval officer recorded events which had transpired at an Air Force base. This, of course, cannot operate as a bar, if the Naval officer—as in this case—labored under a duty to learn from reliable sources what had taken place there and to record it. *Where* the events took place is of little moment. However, the board went further and stated that, to be admissible for the purpose of showing what had happened at the Air Force base, Exhibit 2 must have been based on "official records made and kept by an officer within the command of the Donaldson Air Force Base who by regulation had the duty to record such events." Manifestly, this constitutes a further restriction on the "official records" exception, sharply limiting the permissible sources of information on which the officer preparing the particular report may safely rely. Such a restriction is entirely unwarranted, we believe. When an "official record" is offered in evidence, and it appears that it was prepared by a military person charged by regulation with the duty of doing so, it will be presumed that it was prepared in accordance with regulations, and by one who knew, or had the duty to know or to ascertain the truth of, the facts or events recorded. United States v. Masusock, supra. If it can be shown that the data reported are inaccurate, or even that the source of the reporting officer's information was not "reliable," these are matters for the defense to bring forward. No such attempts were made here.

We held nothing at variance with any of this in Masusock. What we said there is set out below, as quoted in the opinion of the Board of Review:

"Furthermore, there is a presumption that the records emanating from *official unit sources* are the records required by regulation to be kept and that the person recording even though not shown as the commanding officer knew or had the duty to know or ascertain the truth of the facts or

events recorded." [Emphasis supplied by the board].

We have difficulty in understanding how this language could have been misconstrued. It does not at all say that the events recorded must have *taken place* within the unit of the officer making the report. Neither does it say that information as to such events must have been obtained from *sources* within the command of the recording officer. Certainly, sources outside the command— particularly those of a military nature —may be wholly as reliable as those within it. All we meant to accomplish by use of the phrase, "official unit sources," in that portion of the Masusock opinion, was to furnish a descriptive designation for the customary and usual well of official records. The problem here involved was not before us in Masusock.

## V

Accused has also argued that he could not be convicted lawfully under the second specification of desertion and of the escape from confinement because, at the time of the commission of these alleged offenses, the first desertion had not been ended by return to *Naval* custody. Underlying this argument, of course, is the contention that his delivery to and confinement by Air Force authorities did not constitute a legal termination of his absence. In support, he cites a provision of the Navy's Bureau of Supplies and Accounts Manual to the effect that, in computing the duration of an absence without leave, the day the absentee returns to "naval jurisdiction" is to be treated as a day of absence. In brief response, we need only say that, whatever may be the duration of an absence for the purposes of the Bureau of Supplies and Accounts, the Bureau's view is hardly conclusive of the question when raised in a punitive proceeding.

We do not believe that unauthorized absences of Naval personnel cannot be terminated legally other than by actual return to *Naval* custody. Such a position is wholly contrary to—in fact, does sharp violence to—the spirit of the Uniform Code, and to the principle of serv-

ice unification as well. Certainly an unauthorized absence is legally ended by return to *military control,* regardless of whether that control be exercised temporarily by a service other than that of the offender involved. This is fully recognized in the language of paragraph 164a of the Manual for Courts-Martial, United States, 1951, which states, in relation to unauthorized absence, as involved in the offense of desertion:

". . . . Having once been shown to exist, the condition of absence without proper authority with respect to an enlistment or appointment may be presumed to have continued, in the absence of proof to the contrary, until the return of the accused *to military control* under that enlistment or appointment. . . ." [Emphasis supplied].

That the critical element here is the return to *military control* rather than to that of the particular service of the absentee, has been implicitly recognized, we believe, by both the Air Force and the Coast Guard. See ACM S–1783, Briggs, 2 CMR 653; CGCM 9761, Mayer, 4 CMR 505.

It has also been suggested that it is improper to hold that one may become guilty of a Navy desertion by absenting himself without leave through escape from an Air Force station following initial apprehension as a Navy absentee. The short and obvious answer to this criticism is that the accused, while in the custody of a sister service, was held for and in behalf of the Navy. Certainly the accused's original unauthorized absence terminated neither his Navy obligations nor his organizational assignment in that service. In legal effect, his return to military control, through delivery to the Air Force, was a return to the Navy. If this were not true, no absence from an Armed Force could be regarded as terminated until the offender's delivery to the particular service of which he is a member—and this, as we have just observed, is not the case.

The question certified is answered in the affirmative, and the record is remanded to The Judge Advocate General, United States Navy, for reference to the Board of Review for further consideration in light of this opinion.

Chief Judge QUINN and Judge LATIMER concur.