UNITED STATES, Appellee

v.

JAMES C. WILSON, Jr., Private E–1, U. S. Army, Appellant

(4 USCMA 3, 15 CMR 3)

LT COL Herman P. Goebel, Jr., U. S. Army, LT COL James C. Hamilton, U. S. Army, 1ST LT Patrick H. Thiessen, U. S. Army, and 1ST LT Paul Berger, U. S. Army, for Appellant.

LT COL William R. Ward, U. S. Army, and 1ST LT Ezra B. Jones, Jr., U. S. Army, for Appellee.

## Opinion of the Court

PAUL W. BROSMAN, Judge:

Following trial by a general court-martial convened at Tomioka, Honshu, Japan, the accused was found guilty of desertion and of escape from confinement. The specifications, framed under Articles of War 58 and 69, 10 USC §§ 1530 and 1541, alleged that the accused had, on February 5, 1951, escaped from confinement in the Post Stockade, Camp Drake Replacement Depot, Honshu, Japan, and that thereafter he had remained absent in a status of desertion until apprehended at Yokota Air Base on August 8, 1952. The convening authority approved the court's findings of guilt, save that portion relating to termination of the desertion through apprehension. Subsequently a board of review in the office of The Judge Advocate General, United States Army, affirmed the findings and sentence as approved. The accused's petition challenges the admissibility of the prosecution's evidence, as well as the sufficiency of the evidence, if admissible, to support the findings either as to desertion or escape.

### II

The prosecution sought to achieve a conviction in the case at bar through the introduction of a single exhibit—a morning report extract copy containing entries relating to each offense charged. Aside from a minor and incidental matter, of which the court-martial took judicial notice, its members had before them literally nothing else—offered by either prosecution or defense—upon which to reach their determination of

guilt or the reverse. The morning report extract relied on by the Government consisted of an entry for September 22, 1952, which corrected an entry of August 21, 1951, in the following terms:

CORRECTION (21 Aug 51)

"Wilson James C RA 16322760 RCT Fr Dy to Rel asg & reasg to 15th Repl Co (P) 1st Cav Div APO 201 par 105 SO 143 Hq Japan Repl Tng Cen 8042d AU APO 613 eff 11 Dec 50

SHOULD BE

Voided (Erroneous Entry)

Wilson James C RA 16322760 RCT Dy to Conf Post Stockade APO 613 eff 1 Feb 51

Wilson James C RA 16322760 RCT Conf Post Stockade APO 613 to Escaped AWOL eff 5 Feb 51

Wilson James C RA 16322760 Pvt Fr AWOL to Hands Mil Auth Yokota Air Force Base 1950 hrs eff 8 Aug 52 to hands Mil Auth Cp Drake Repl Depot 8042d AU APO 613 2145 hrs eff 8 Aug 52."

### III

Defense counsel have argued before us that the morning report utilized to establish the escape, as well as the inception of the accused's absence, did not reflect compliance with official duties by the person preparing it. To support this contention, they rely on the requirement of Army directives to the effect that an entry relating to unauthorized absence or escape must be made

immediately after ascertainment of the absence or escape. SR 335–50–1, August 16, 1951, paragraphs 61, 62; SR 345–400–1, October 12, 1949, paragraphs 42, 43. How—they inquire—could the accused's escape or his absence possibly have gone unobserved during a period of some nineteen months? If noticed during that course of time—the argument continues—the duty existed forthwith to effect an entry reciting the escape or absence; and entries made long thereafter must be deemed inadmissible since not made as promptly as required.

In the first place, we must register dissent from any premise of counsel that the accused's absence or escape was in fact ascertained prior to September 1952 by any military person responsible for the preparation of morning reports dealing with him, and who was aware that he had not been entered thereon as being in a status of absence without leave. The possibilities of error in personnel accounting are both numerous and understandable in a replacement depot, such as Camp Drake seems to have been. Moreover, although Army directives command promptness in the preparation of morning reports, they recognize as well the likelihood of occasional error. Indeed, they require specifically that "A corrective entry will be made when an entry reported on a previous morning report is determined to be in error"—this entry to be made "on the morning report prepared for the date on which it is determined that a prior entry is in error." SR 335–50–1, paragraph 73; SR 345–400–1, paragraph 56.

We are aware of no limitation of time governing the making of a corrective entry, and none has been called to our attention. In fact, the necessity for such a correction would seem properly to bring it within the popular precept "better late than never." It must not be overlooked that morning reports serve numerous purposes in the military services. They furnish significant historical information of value in personnel accounting and in related management and planning. In addition, they afford data often used in connection with the adjudication of substantial claims against the Government and with critical determinations by the Veterans' Administration. Because of these varied and important uses, some extending into a period long after the events recorded, it seems unthinkable that the Government would not demand the correction or deletion of a statement determined to be erroneous—no matter when the original entry had been made. There is nothing in Army regulations, either of provision or purpose, which exempts corrective entries from the general standard of punctiliousness in the preparation of morning reports—a standard emphasized by such cautions as the following. "Accuracy is of the utmost importance in the preparation of the morning report. Errors in names or in any facts or figures may have far-reaching effects and will be carefully guarded against." SR 335–50–1, paragraph 9c; SR 343–400–1, paragraph 7c. Noncompliance with this duty of accuracy would certainly carry for the entrant the same sanctions regardless of whether an initial entry or a corrective one be involved. Accordingly, we must reject any defense assertion that because of the time factor, no official duty prompted the preparation of the entries now before us, or that they were not made in accordance with regulations.

Appellate defense counsel have also insisted that the corrective entry of September 22, 1952, should be deemed inadmissible because the entrant must necessarily have lacked personal knowledge of the events he purported to record, and would have had access to no reliable source from which to ascertain the truth concerning those events. Indeed, at the trial this argument was emphasized by the voiced suggestion of counsel for accused—and perhaps, as a matter of tactics, unwisely presented—that the accused was the only person who would know, and hence must have furnished, the information incorporated in the corrective entry. This conclusion seems gratuitous—for, even in a replacement center, there is much stability of assignment as to permanent party personnel. Moreover, records and reports on file at Camp Drake could well have furnished reliable sources of in-

**5**

formation on which to ground the later entry. With appropriate regard for the presumption of regularity—United States v. Masusock, 1 USCMA 32, 1 CMR 32—we cannot brand as inadmissible the instant morning report extract, despite the lapse of time involved. United States v. Boone, 70 BR 223.

### IV

Since the use of morning report extract copies to establish escape from confinement has not received our express attention heretofore, it is appropriate to mention that the Manual for Courts-Martial, United States, 1951, paragraph 144*d*, authorizes their use in the following words:

"... Official record entries in morning reports, logs, unit personnel diaries, and service records as to absence without leave, and *in the above records* and in guard reports as to escape from confinement, are not inadmissible . . ." [Emphasis supplied.]

That such entries are made in the performance of an official Army duty is left in no doubt by the regulations governing morning reports. In fact, an entry reflecting escape is used as an example in each of the directives conceivably applicable to the morning report here concerned. SR 335–50–1, paragraph 62, Figure 31; SR 345–400–1, paragraph 43, Figure 48.

Since an entry reporting escape is admissible, we would experience no hesitation, in the usual case, in holding that it sufficed to support a court's finding of guilt—just as a morning report entry will ordinarily suffice as prima facie proof of the beginning or end of an absence without leave. Manual, supra, paragraph 164*a*. Boards of review have expressly held that documentary evidence may constitute a prima facie showing of escape. United States v. Williams [ACM 4030], 1 CMR 626; United States v. Fabrizio [ACM 5447], 6 CMR 623. Likewise, it would be impossible to distinguish from the present problem the reasoning of our previous opinions holding that a finding of apprehension in a desertion case may, in a proper case, be rested solely on an official entry, or that a finding of breach of arrest is supportable on the basis of service record book entries alone. United States v. Coates, 2 USCMA 625, 10 CMR 123; United States v. Lowery, 2 USCMA 315, 8 CMR 115; United States v. Barrett, 3 USCMA 294, 12 CMR 50.

### V

We come now to the question of whether—conceding the admissibility of the morning report extract copy, and its applicability to both offenses charged—the Government's evidence may be said to be sufficient as a matter of law. Upon several occasions we have observed that the lapse of time between the happening of the event recorded and the making of a morning report entry will have significance in determining the weight to be given that entry. United States v. Hagen, 2 USCMA 324, 8 CMR 124; United States v. Williams, 1 USCMA 186, 2 CMR 92; United States v. Barrett, supra. The credit to be accorded the morning report statement here is certainly affected in some measure by the inference that, if the escape and unauthorized absence had occurred at the time stated, they would—long before the expiration of nineteen months—have been brought to the attention of those persons responsible for the preparation of morning report entries concerning the accused. Moreover, it cannot be gainsaid that, after the passage of such a period, the recollection of events by many persons may have grown dim. While these infirmities do not, we consider, operate to destroy competence, they do operate to raise the question of whether we should uphold convictions of desertion and escape supported solely by a single document characterized by such flaws—at least such weakness—without a shred of corroborative testimony or other evidence.

It is urged—indeed not without a certain plausibility—that, in view of the massive character of the Army's oversight in "losing" the accused for the lengthy period involved, it is not

6

unnatural to doubt whether the corrective entry may not be as completely infected with error as was the original statement corrected. It is further suggested that, had the accused been guilty of no escape, and had he been present for duty during all—or a large portion—of the period during which he was allegedly absent, he would doubtless experience serious difficulty in securing evidence to corroborate his entirely truthful account. The relative disorganization of a tremendous replacement center, with its continually shifting population—a factor which would necessarily create difficulty for the Government in securing accurate information concerning the accused after the passage of nineteen months—would perforce operate to produce even greater obstacles to the quest of the latter. Thus the proposal runs. Related is the further argument that, in a case of unusual tardiness like the present one, any account of the accused—however truthful—that he was in fact present with his organization during the desertion interval alleged, would necessarily be of such an extraordinary nature as to render it probable that the court would hesitate to credit it, and would instead rest conviction on the Government's concededly flaccid case. The net of these proposals, of course, is that this Court should demand additional corroborative evidence in the case at bar, and in its absence should reverse the board of review and dismiss the charges for insufficiency.

There is much of force in some of the positions of appellate defense counsel—for the Government's case, standing alone, is undeniably weak. This is not to say, however, that it does not meet minimum standards. We have earlier held herein that the morning report extract in suit was admissible in evidence, and that its entries tended in some degree to establish the truth of the matters asserted in them. Moreover, we have held that as to the offenses with which we are now concerned, a morning report case must be deemed a prima facie case in most instances. No evidence whatever was tendered by the defense at the hearing of the case at bar. Had its personnel offered countervailing and not inherently improbable evidence of any nature, we would be confronted by a case which is not before us now. In the present posture of the record, it simply cannot be said that the conviction was based on evidence which is insufficient as a matter of law—this under any view taken by this Court or a member thereof. United States v. McCrary, 1 USCMA 1, 1 CMR 1; United States v. O'Neal, 1 USCMA 138, 2 CMR 44; United States v. Peterson, 1 USCMA 317, 3 CMR 51. Even under the broadest rule adhered to by any of us—that laid down in the O'Neal case, supra—were we to dismiss, it would be necessary that we conclude that all reasonable minds would "be in agreement that reasonable hypotheses other than guilt could be drawn from the evidence." No one of us can do this. It is indeed true that the Government must establish its case and that the accused must be free—both legally and practically—to take the stand or not as he will. But these considerations are not involved in our problem. Our specific chore is to determine whether the admissible morning report extract here constituted a prima facie case as to the two crimes charged. We cannot say that it did not.

VI

Two further matters must be mentioned. The not unreasonable demand of appellate defense counsel for corroboration has been reported in that portion of the present opinion dealing with evidential sufficiency. But was such support in fact available? In sorrow we must announce that it was. We need rely in no degree on conjecture in making this assertion, for the allied papers bound with the record of trial—but, of course, not a part of it—reveal clearly that the pretrial investigation had unearthed more than trifling corroborative matter. Thus, prior to trial there had been disclosed the existence of available documentary evidence which beyond peradventure would have sustained the findings returned by the court in this case. But it was not utilized by trial counsel below. Why? Was it because he was downright slipshod in the preparation of his case, or was it because he was operating under a ground rule,

based on administrative considerations, and requiring a precipitous handling of cases on minimal evidence? We cannot know, of course.

However, we can be assured with virtual certainty that, had trial counsel done—or been permitted to do—his duty as a prosecutor, this case would never have come before this Court. Thus our effort would have been conserved, and so would that of the Government and defense appellate divisions in the office of the Army's Judge Advocate General. In other words, wholly unnecessary expense to the Government in both time and money would have been avoided had trial counsel here done his job in a lawyer-like manner. The likelihood that record corroboration might well have been found should have been obvious—for it is well known that the military services require numerous special reports and procedures in connection with confined personnel. See, for example, SR 345–90–1, dated October 24, 1949. Therefore, from guard reports, military police logs, and the like, documentary evidence reflecting the accused's escape could presumably have been obtained—and was in fact to be had. These sources could and should have been consulted. In the very first case handed down by this Court—that of United States v. McCrary, supra—we found it necessary to inveigh against the willingness of trial counsel to rely on the thinnest sort of a prima facie case—and we are still required to reprobate the regrettable practice. Dare we hope that at some future time safer and sounder procedures will be adopted?

Brief reference has been made above to the suggestion of defense counsel at the trial that the accused, himself, may well have been the sole source of the morning report entrant's information concerning the dates alleged in the specification. Perhaps he was, but we cannot know—for the record does not tell us. Had this suggestion been based on fact, and had this fact been established through the testimony of the entrant, we would have another case. In such a situation it would have been arguable, at least, that the morning report should be assimilated to a confession—and thus, in the setting of the instant cause, corroboration would have been demanded. See Manual, supra, paragraph 140a, page 251. In this way trial counsel might have been compelled to use the supporting evidence ready to hand. But defense counsel did not lay the foundation necessary to raise this question. Perhaps he was not able to do so—but, as we have said, we are not informed in the premises.

It follows from what has been said that the decision of the board of review must be affirmed.

Chief Judge QUINN and Judge LATIMER concur.