UNITED STATES, Appellant

v.

WILLIAM A. BENNETT, Private, U. S. Marine Corps, Appellee

4 USCMA 309, 15 CMR 309

CAPT Wesley C. Blake, USMC, for Appellant.
CDR G. V. Reynolds, USN, and LCDR John J. Nelson, USNR, for Appellee.

## Opinion of the Court

PAUL W. BROSMAN, Judge:

A general court-martial convened at the Marine Corps Recruit Depot, Parris Island, South Carolina, tried the accused, Bennett, on specifications alleging (1) unauthorized absence from October 29 to October 30, 1952; (2) failure to obey an order from the Commanding General, 38th Air Division, Hunter Air Force Base, to report to Camp Lejeune, North Carolina, on November 14, 1952; and (3) desertion commencing on that date and terminated by apprehension on February 2, 1953. The accused was found guilty as charged, and the findings and sentence were approved by the convening authority. However, a Navy board of review concluded that there was no competent evidence to support the findings of failure to obey and of apprehension. This determination by the board has been certified to us for review by The Judge Advocate General, United States Navy, pursuant to the Uniform Code of Military Justice, Article 67(b)(2), 50 USC § 654.

## II

All evidence offered prior to findings was documentary. Prosecution Exhibit 1, an extract from the accused's service record book, was admitted without objection and in material portions reads:

"4Dec52: 'A' Co, 1st Bn, 2d Mar, 2d MarDiv, FMF CLNC Absent without authority since 14 Nov52. Issued orders by Hunter Air Force Base, Savannah, Ga to report Camp Lejeune, N.C. 14 Nov52. Failed to report and is a deserter from 14 Nov52."

"11Feb52, MCRDep, PISC, GdCo, H&SBn From unauthorized absence

at 1330 2Feb53 when he was delivered to Marine Personnel in Birmingham, Alabama. Apprehended by FBI 1530 30Jan53 in Northport, Ala."

Prosecution Exhibit 2 was a Formal Report of Deserters or Absentees, NAVMC 10044–PD, identified by the custodian of the service record book as being attached thereto, and among other things stating as to hour, date, and place of surrender or delivery:

"1530, 30Jan53 App by FBI at Northport, Ala. Conf City Jail Tuscaloosa, Ala. for Safekeeping; 1330 2 Feb53 del to Marine personnel; 1500 2Feb 53 del to MCRS B'ham, Ala. Confined Jefferson Co Jail."

Elsewhere on the Report, appeared the question: "In case of delivery, by whom was delivery made?" This was answered, "Apprehended by FBI." The defense objected to "those portions of the offered evidence [apparently referring only to Prosecution Exhibit 2] relating to apprehension." The objection was overruled by the law officer.

As Prosecution Exhibit 3, trial counsel offered a copy of Air Force special orders, identified by the custodian of the accused's service record book as having been attached to it. The copy of orders is in mimeographic form, is captioned "E-X-T-R-A-C-T," and purports to emanate from Headquarters, 38th Air Division, Hunter Air Force Base, Savannah, Georgia. Insofar as pertinent to the accused, the document stated:

"SPECIAL ORDERS 12 November 1952
NUMBER 123
E-X-T-R-A-C-T
29. PVT WILLIAM A BENNETT USMC

**311**

1217707 (W) having been rtrn to mil control fr AWOL on 30 Oct 52 at this sta WP fr this sta o/a 12 Nov 52 CO A 1st Battalion 2 Marine Cp Lejeune, N.C. TO this sta w/furn nec rail and meal tickets. Cost of trans w/b charged against EM on next P/R of his orgn. TDN. 2132010 1–30 P410–02 S99–999. Auth: TWX Marine Div Two dtd 8 Nov 52."

The extract concluded:

"By Command of Brigadier General Grubbs:

Official:     Raleigh H. McQueen
              Major, USAF
                           Adjutant
                           General

/s/ Eugene H. Taylor
Eugene H. Taylor
WOJG, USAF
Asst Adjutant General"

This exhibit was received over objection.

### III

The Extract of special orders, Prosecution Exhibit 3, was clearly admissible to establish the nature ▬▬▬■ and contents of the order alleged to have been infringed by the accused. The Air Force Orders Manual, then in effect, authorized specifically the use of Extracts of special orders, reproduced by mechanical processes—and the Extract offered in evidence by the Government displayed on its face compliance with the requirements set down in that Manual. See AFM 30–3, May 15, 1951, chapter 3, paragraph 29; chapter 1, paragraph 18; AFM 30–3, April 1, 1953, chapter 3, paragraph 26; chapter 1, paragraph 20. Moreover, the Extract showed that the special order from which it had been prepared had been properly authenticated. See AFM 30–3, May 15, 1951, chapter 1, paragraph 12; AFM 30–3, April 1, 1953, chapter 1, paragraph 12. The Air Force Orders Manual contemplates that an Extract of special orders is to be treated by all military personnel with the same deference as the written special orders from which it came. Moreover, the Extract may be published prior to publication of the complete special orders for the day. We think it inappropriate, therefore, to require that the original paper reflecting special orders be introduced in evidence. See AFM 30–3, May 15, 1951, chapter 3, paragraph 29c; AFM 30–3, April 1, 1953, chapter 3, paragraph 26c. For our purpose, the properly prepared Extract of special orders was a duplicate original of the complete written special orders. Manual for Courts-Martial, United States, 1951, paragraph 143a(1).

However, in the Air Force Orders Manual, it is recognized that an order which is individual in its ▬▬▬■ operation—as is the one with which we are now concerned—becomes effective only "upon delivery, actual or constructive to the person concerned." AFM 30–3, May 15, 1951, chapter 1, paragraph 7; AFM 30–3, April 1, 1953, chapter 1, paragraph 7. Nor is this requirement unique to the Air Force. See Marine Corps Manual, paragraph 22055. Also, as a predicate for conviction of failure to obey a special order, a court-martial must determine that the accused knew of the order allegedly disobeyed. Manual, supra, paragraphs 171b, 154a(4). Thus, the finding of guilt in the instant case must fall, unless the record contains evidence sufficient to show delivery of the special order in some form to the accused.

The Air Force describes special orders as "directive in nature and individual in application." AFM 30–3, May 15, 1951, chapter 3, ▬▬▬■ paragraph 2; AFM 30–3, April 1, 1953, chapter 3, paragraph 2. Distribution of special orders "will include each person and unit named in the order, in addition to any standard distribution requirements established by the unit publishing the order." AFM 30–3, May 15, 1951, chapter 1, paragraphs 3, 19a; chapter 3, paragraph 31; AFM 30–3, April 1, 1953, chapter 1, paragraph 21; chapter 3, paragraph 28. The Air Force Orders Manual then in force, unlike the edition currently effective, appears to want an express statement to the effect that distribution of orders "will be made on date of publication when practicable and never later than the first working day after publication."

See AFM 30-3, April 1, 1953, chapter 1, paragraph 21a. However, since the order extracted directed duty to be performed on or about November 12, 1952 —the date of the order—and since that order could not become effective until delivery to the accused, the reasonable intendment of the Orders Manual then in force would encompass a duty to accomplish distribution as promptly as practicable. In light of the presumption of regularity, we believe the court-martial could reasonably have inferred that on November 12, 1952, an effort was made to distribute to the accused a copy of special orders directing his departure for Camp Lejeune, his home station. Manual, supra, paragraph 138a; United States v. Masusock, 1 USCMA 32, 1 CMR 32; United States v. Taylor, 2 USCMA 389, 9 CMR 19.

The inference that the special order of November 14, 1952, or an EXTRACT thereof, was communicated to the accused receives support from Prosecution Exhibit 1, referring to orders "issued" by Hunter Air Force Base, and a subsequent failure to obey them by reporting. As this entry ▮▮▮▮▮▮▮▮ in the accused's service record book was made pursuant to an official duty imposed by the Marine Corps Manual, paragraph 15052 (3.d), it is admissible to show issuance of the orders. United States v. Coates, 2 USCMA 625, 10 CMR 123. Perhaps the reference to orders "issued" contains ambiguity as to the delivery of such orders. However, the service record entry also discloses an absence beginning November 14, 1952. The military person making this entry labored under an official duty to indicate the "hour, date and place of commencement of unauthorized absence." Marine Corps Manual, paragraph 15052 (1.i). If the accused departed ▮▮▮▮▮▮▮▮ Hunter Air Force Base without having received special orders authorizing such departure, he would have been deemed absent without leave as of the time he left the Base. This is true for the reason that, if no copy or extract of special orders was delivered to him, the order did not become effective as authority to depart from Hunter for his home station. Although the absence would ▮▮▮▮▮▮▮▮ have begun at an Air Force Base, rather than at a Marine station, it would constitute absence without authority from the accused's duties as a Marine. United States v. Coates, supra. ▮▮▮▮▮▮▮▮ Under such circumstances, the absence would have commenced prior to November 14, 1952 —the accused's reporting date at Camp Lejeune—and would have begun at Hunter Air Force Base. Therefore, the entry in the service record book would not have complied with the official duty of the entrant to know and to indicate the time and place when the unauthorized absence began. Obversely, applying the presumption of regularity to the entries of the service record book produces a conclusion that orders were "delivered" the accused directing his departure from Hunter Air Force Base, and that he departed therefrom pursuant to those orders.

While certain of the permissible inferences relied on in our analysis of the present branch of the ▮▮▮▮▮▮▮▮ case are necessarily and properly based on the provisions of Air Force directives, we note that the Marine Corps Manual—as well as common sense—contemplate a delivery of special orders "through the usual channels" to the persons concerned. Paragraph 22055. We believe that no unduly harsh burden has been placed on the accused. Experience indicates that, in accord with the maintenance of rudimentary military system and discipline, special orders normally *are* delivered to persons concerned —especially when, as in the instant case, immediate travel is directed. Indeed the accused could, as he did, rely on the hope that the court-martial might deem that some failure had occurred in the delivery of orders. On the other hand, he certainly could have offered evidence—if it existed—either that he was unavailable to accept delivery, or that he did not receive them in fact. No evidence of this nature was tendered. The result we have reached, we deem to constitute no more than a further instance in which the "balance

of convenience can be redressed without oppression to the defendant." United States v. Gohagen, 2 USCMA 175, 7 CMR 51.

## IV

Prefatory to our treatment of the evidence supporting apprehension, we must confess to considerably greater misgivings than appear to have been harbored by appellate defense counsel, who at the hearing before us, and in reliance on United States v. Coates, supra, conceded the sufficiency issue presented by the certificate of The Judge Advocate General. We feel that in so doing they misconceived the import of Coates. There we relied on Naval directives, as found in the Bureau of Naval Personnel Manual, which we interpreted to impose on Navy personnel an official duty to enter in an absentee's service record book a statement to the effect that his absence was terminated by apprehension, if such was the case. At that time we distinguished various Army and Air Force decisions dealing with morning report entries of apprehension by pointing out that the rationale of those cases was that, under applicable Army and Air Force directives, there was *no* official duty to record apprehension of an absentee in the morning report.

Since the Marine Corps has promulgated its own Manual, which includes procedures having to do with the keeping of service record books, and since that division of the Armed Services appears to be in no way bound by the provisions of the Bureau of Naval Personnel Manual, we cannot, without more, come to the conclusion reached in Coates. Instead we must examine applicable directives carefully to determine if Marine Corps people labor under the same official duty as other Navy personnel to enter the fact of apprehension in an absentee's service record book.

Unlike Article C–7804(3a), found in the Bureau of Naval Personnel Manual, the Marine Corps Manual contains no express requirement that "circumstances of *return,* whether surrendered or delivered," be entered in a service record book. (Emphasis supplied.) However, this latter directive does require that the service record book reflect "in cases of desertion, known attending circumstances and rewards offered." Paragraph 11217(2). Elsewhere mention is made of specific types of information which should be entered therein—but these requirements unmistakably appear to be concerned with entries to be made *prior* to the return of an absentee to military control. Paragraph 15052; and see Advance Change Letter, No. 12 to Change No. 4, April 1953, paragraph 15053(12). Since, in a certain remote sense at least, the manner of return to military control may be deemed to be found among the "attending circumstances" of a desertion, we have, only after some hesitation, concluded that at the time of the accused's return to military control *no* official duty to record apprehension or surrender in the service record book existed in the Marine Corps. The reference to "known attending circumstances," we have decided, was directed to events known as of the time when an unauthorized absence commenced, or subsequently when the absentee was declared a deserter, and not to events known only at a later date when an entry was included in the service record book to reflect return to military control.

The Corps' Manual directs the preparation of a Formal Report of Deserters or Absentees, and refers to the very form, NAVMC10044–PD, on which Prosecution Exhibit 2 was prepared. Paragraph 15061; Advance Change letter, supra, paragraph 15055. Under the directive in effect at the time of accused's return to military control, it was demanded that this report include the "hour and time of surrender or delivery." As will be noted, however, this requirement does not at all equate to a direction to enter the "circumstances" of return to military control and the method of termination of the absence—the content of Prosecution Exhibit 2 to which the defense objection was directed. It is true that the Marine Corps Manual does provide that, in case of delivery, the report shall include the name of the person by whom

delivery was made, whether claim of reward was perfected, and whether the claimant had signed a voucher therefor. Paragraph 15061 (1.c). It may be said parenthetically that a reward was, at the time, authorized under certain circumstances for the apprehension of deserters or stragglers pursuant to a Descriptive List of Absentees Wanted. Paragraph 15053; Advance Change Letter No. 7 to Change No. 2, May 1952, paragraph 87155. While information as to apprehension would be of incidental value in passing on the propriety of a claim for reward in connection with the return of an absentee to military control, we cannot conclude from the language of the Manual that the person preparing such a report labored under an official duty to name the agency concerned and to designate the manner of an unauthorized absence's termination.

It has been suggested that the Marine Corps has during recent years developed the custom of reporting the fact of apprehension or surrender in service record books and in the Formal Report mentioned earlier herein. However, while evidence is available suggesting that such a custom may have existed in other branches of the Navy, we have been unable to discern from the information presented to us the existence of such a custom in the Marine Corps. In all sincerity, we doubt that any Marine would argue that we may safely overlook the possibility that in numerous respects the customs—like the directives—of the Marine Corps differ sharply from those of the remainder of the Naval forces.

At the instance of Government appellate counsel we have examined with care the totality of Marine Corps directives affecting personnel accounting. However, despite our discovery that an express duty exists to record apprehension or surrender in the *unit diary* of the reporting unit to which an absentee is attached upon his return to Marine control, we cannot conclude that there exists a duty of the sort which is urged on us here. As a matter of proper construction, we are simply unable to agree that this indicates the existence of a duty to record apprehension either in the service record book of the absentee or in the Formal Report pertaining to him.

On June 19, 1953, the Commandant of the Marine Corps issued a directive requiring that entries as to apprehension or surrender be made in the service record book and in the Formal Report of Deserters or Absentees. Letter DKA–1746–e, Subject: Reporting circumstances of the return to military control of absentees and deserters. A superseding directive on the same subject differs only in that it requires the inclusion of additional information concerning the circumstances of apprehension or surrender—information apparently useful in the preparation of depositions in appropriate cases. DKA–1746–e, August 4, 1953. It has been intimated that these command letters should be construed to constitute no more than the clarification of an existing duty. However, we are of the opinion that a more likely explanation for the publication of these highly specialized directives is that the Marine Corps had recognized that a duty to record apprehension did not exist under its Manual and—whether to bring the Marine practice more nearly into conformity with that of the Navy, or from other motives—decided that such an obligation should be established and its existence promulgated. In any event, while these command letters leave no doubt that following June 19, 1953, a duty has existed in the Marine Corps to record apprehension of deserters in service record books and in the Formal Report, they do not at all disturb our conclusion that, as of the period germane to the case at bar, no such duty was recognized.

Concededly, in reaching these conclusions, we have been influenced by analogies found in Army and Air Force morning report cases refusing to infer the presence of an official duty to record the fact of apprehension despite regulatory language distinctly more susceptible to such an inference than that of the directives now before us. See United States v. Hurshman, 5 CMR 242; United States v. Palmer, 8 CMR 633; United States v. Sulecki, 6 BR-JC 97; United States v. Nall [ACM

**315**

3180], 3 CMR(AF) 736. Of course, we recognize that the Marine Corps is in no wise bound by the interpretation placed by other services on their own regulations. However, we deem relevant the cases cited above for the reason that they appear to demand a clear statement of official duty before determining that such an obligation exists. The conclusion is unavoidable that this clear statement is absent in the case before us. Out of an abundance of caution, we should perhaps add that the decision in United States v. Coates, supra, was in no respect designed to impinge on the rationale of the numerous Army and Air Force decisions holding that morning report entries reflecting apprehension are inadmissible under the hearsay rule. Moreover, we are little disposed to substitute for those decisions our own views concerning official duties imposed by the necessarily technical Army and Air Force directives governing the preparation of morning reports. Unless and until those directives are modified, the result of existing Army and Air Force decisions will stand so far as we are concerned.

It must be clear that the distinction in outcome between Coates and the case at bar hinges wholly on differences in the duties imposed by the directives under which the documents reporting apprehension were prepared. Uniformity in result as among the several services is indeed a goal to be sought. However, this Court cannot with propriety achieve this happy end in instances where—as here—judicial action must be geared to the regulations of the several services, and where these regulations differ among themselves. Thus, while recognizing that a prima facie case of desertion terminated by apprehension is appreciably less difficult of establishment in a court-martial conducted under Navy auspices—or under those of the Marine Corps under current directives—than in one administered by the Army or Air Force, we are troubled little by this lack of uniformity. It is attributable solely to differing regulations among the several Armed Forces—and these may be changed at will. Each service may well be able to cite sound policies in support of its present position in this area—and naturally we express no opinion in the matter.

## VI

The certified question having been answered, the record of trial is returned to The Judge Advocate General, United States Navy, for action in accordance with the principles announced here. Principally, of course, this action will take the form of a reference to a board of review for reconsideration of appropriateness of sentence.

Chief Judge QUINN concurs.

LATIMER, Judge (concurring in part and dissenting in part):

I dissent from that portion of the majority opinion which holds that there is no requirement placing an official duty on members of the Marine Corps to report the fact of apprehension of a deserter. That Corps being an arm of the United States naval service, we should, if reasonably possible, interpret its regulations so as to be consistent with those of the parent organization.

The pertinent regulations of the United States Marine Corps are contained in the Marine Corps Manual, Volume I, Personnel and General Administration, which will be referred to hereinafter as the Manual. A perusal of the specific regulations relative to service record entries will establish that the Court's opinion too narrowly restricts their fair import and meaning. I believe that in determining the necessity for making official entries, it is only necessary that we find the Marine Corps regulations fairly require the entry. Certainly, an interpretation should not be made which casts aside information necessary to proper personnel accounting and essential to good administration. My associates quote from paragraph 11217(2) of the Marine Corps Manual and then say that provision applies only to entries prior to return. I disagree. That paragraph is entitled "Offenses and Punishments." The first paragraph deals with punishment, acquittals, and the nature of the court trying the accused. All of that information is subsequent to return. The second paragraph reads:

316

"In cases of unauthorized absence, give date and hour from and to which the offense occurred or whether over leave or without leave. In cases of desertion, show known attending circumstances and rewards offered."

The first sentence concerns unauthorized absence, and the reporting officer must show the date and hour, from and to which, the offense occurred. Certainly the hour of surrender or apprehension, that is, the time to which the offense extends, is not prior to the return to the military service. The same reason applies to desertion, and I find no good purpose served by grafting an imaginary limitation into the second sentence, particularly when there are other paragraphs which seem to suggest that all pertinent data be recorded.

Paragraph 15058 of the Manual sets out the information to be officially recorded when delivery of a Marine Corps absentee is made by the representatives of the United States Army or Air Force. That paragraph requires that the commanding officer or officer in charge, to whom the straggler or deserter is delivered, secure from the returning service a signed written report setting forth certain information for evidence before a court-martial, including the circumstances attending the arrest or surrender. Apprehension is an essential circumstance for that purpose (see United States v. Coates, 2 USCMA 625, 10 CMR 123), and I believe information which must be obtained from another service for possible prosecution should be included in the accused's service record.

The next paragraph of the Manual (15059) which concerns us deals principally with those offenders who are guilty of absence without leave. That paragraph imposes a duty upon the reporting officer to state the circumstances of the return of the straggler in a report to the man's original or home organization with an information copy to the Commandant of the Marine Corps. The wording of the paragraph is as follows:

"1. When a straggler from another organization surrenders, is delivered, or is apprehended within 30 days from the time of his original absence, the commanding officer to whom the individual surrenders, is delivered, or by whom he is apprehended will immediately inform by dispatch the commanding officer of the organization from which the straggler states he absented himself, giving the date and hour of original surrender, delivery, or apprehension, disposition being made of straggler including, if applicable, probable time and place of arrival and type of transportation furnished. The Commandant of the Marine Corps (Code: DK) will be made an information addressee. In the event such report is received by an officer not having custody of the service records of the absentee, it will be forwarded immediately to the organization that does have custody of the service records."

Conceding that the information required by the foregoing paragraph is intended to cover those individuals who have been absent for less than thirty days and have not yet been officially charged as deserters, the line of distinction between desertion and absence without leave is indistinct. In many instances, a person absent more than thirty days has not become a deserter, and the same information is of equal importance to the service whether the period of absence is greater or lesser than the stated period. Is it not drawing an arbitrary distinction to say an entry showing apprehension is official if an absentee is picked up on the 29th day of his absence but is unofficial if the return is on the 31st day?

Passing now to the entries affecting a deserter, we turn to paragraph 15060 which provides for a dispatch report of deserters. It reads:

"1. When a deserter is returned to the Marine Corps, either by surrender, delivery, or apprehension, except when it has been officially reported that the deserter was apprehended by the Federal Bureau of Investigation, a report will immediately be sent to the Commandant of the Marine Corps (Code: DK) by dispatch by the Marine Corps activity first

**317**

taking custody, giving the name and service number of the deserter, the date of his surrender, delivery, or apprehension, and place where deserter is being held or confined.

"2. The report is necessary in order that Headquarters, U. S. Marine Corps, may promptly advise the Federal Bureau of Investigation of the return of deserters whom it has requested the Bureau to apprehend."

Here the accused was apprehended by the Federal Bureau of Investigation and so it was not necessary to send a dispatch; but had one been required, it would have been necessary to show the date and manner of return. At least that regulation places a duty on officials to distinguish between surrender and apprehension. But more to the point is the fact that paragraph 15061 requires a complete report regardless of the person or agency apprehending the absentee. It states:

"1. When a deserter or straggler surrenders or is delivered, or reports under orders to a Marine Corps activity, a written report, Form NAVMC 10044-PD, will be made immediately, and distribution made as indicated on the form except that in the case of a straggler who surrenders or is delivered at his place of duty no report is required. The written report will cover the following points:

"a. Hour and date of surrender or delivery. When delivery is made to a Marine Guard sent to take charge of a deserter, the place, hour, and date of delivery to the guard by the civil, or other authorities will be shown.

"b. Date and place of unauthorized absence as stated by the individual.

"c. In case of delivery, by whom delivery was made, whether claim is made for reward, amount, and whether claimant has signed voucher therefor. When claim is made for reward, voucher will be immediately prepared and forwarded in accordance with the provisions of Chapter 87."

It seems to me that to limit subpara-

graph (a) so as to exclude apprehension is far too narrow in scope. The effect of that construction would be that an entry showing the accused surrendered on a given date would be official while an entry that he was apprehended on the same date would be unofficial. While only surrender and delivery are mentioned, I would not exclude other methods of return as the particular manner of return affects both the accused and the Government.

Going one step further, I point out that a reading of the last two quoted subparagraphs of the Manual show that the method of terminating a deserter's absence must be the subject of a special dispatch by the Marine Corps activity first taking custody, except in cases where apprehension was made by an agent of the Federal Bureau of Investigation. If that organization apprehends the accused, no special dispatch is forwarded as it will obtain the desired information from its own sources. However, regardless of the agency or the person taking the accused into custody, the official report required by paragraph 15061, to wit, NAVMC 10044-PD, must be submitted. If that report does not show apprehension by the Federal Bureau of Investigation, then the Commandant of the Marine Corps, other major commands, if involved, and the accused's unit will not obtain information that that agency is involved and a duplication of effort might result. Where different administrative action is dependent upon the identity of the person or the agency taking an absentee into custody, the records should be specific enough to identify the individual or department involved. Moreover, the report must contain information which shows "by whom delivery was made, whether claim is made for reward, amount, and whether claimant has signed voucher therefor." That seems to me to suggest that the report must contain sufficient information to show whether a reward is payable to and has been earned by the claimant.

The opinion of the Court states in substance that while information as to apprehension would be of incidental value in passing on the propriety of a

claim for reward, the wording of the Manual is not sufficiently specific to place a duty on reporting officers to state the fact of apprehension and name the apprehending person or agency. That conclusion seems to be founded on reasoning which overlooks the basic considerations for the payment of a reward. The Government of the United States provides for a payment in cash for that purpose and two of the basic requirements for its payment are that the accused be apprehended and that the apprehender be qualified to receive payment. When apprehension is by the Federal Bureau of Investigation, no payment is involved, but otherwise vouchers must be prepared and the claim processed. If money is expended to return the accused to military control, it should be reported officially. Moreover, paragraph 15052 of the Manual specifically requires an entry in the service record showing whether a reward has been offered for apprehension and delivery of the deserter. A complementary entry to complete the record would show apprehension and payment and this should be of particular importance in view of the fact that the deserter is assessed the amount of the reward.

In an attempt to buttress the conclusion they reach, the majority seize upon a weak and doubtful canon of statutory construction. I am unpersuaded that the issuance of directives by Headquarters, United States Marine Corps, specifically mentioning the necessity of including remarks concerning apprehension, is a concession that its regulations did not previously require an entry on that subject. Too many factors influence the issuance of directives. It is to be noted that the board of review decision in this case was rendered on April 20, 1953. The communications were issued sometime thereafter. That decision casts doubts upon what I believe had been deemed a well understood obligation to record the method of return, and I would venture to suggest the directives were to make certain that which was rendered uncertain by that decision. Furthermore, their publication at that time would forestall any possibility of errors creeping in other cases while this case was pending on appeal to this Court. From our holding, it would appear that the ounce of prevention boomeranged into a confession of weakness.

I have mentioned that the board of review decisions cast doubts upon what had been deemed a clear obligation. I am fortified in this conclusion by the fact that counsel for both parties conceded that our decision in the case of United States v. Coates, supra, was dispositive of this issue. Their concession must have been based on a belief that the regulations and customs of the Marine Corps imposed on administrative officers the same duty as those imposed upon naval officers by naval regulations. I would not enforce a concession inadvertently made, but counsel for a particular service should be in a better position than the Court to know the administrative procedure used in personnel accounting. Perhaps the reason for the concession is highlighted by the difficulties encountered by the Court in laboriously drawing what I believe to be an indistinguishable difference between Navy and Marine Corps regulations.

In summation, I would conclude that there is a duty in all instances to note the fact of apprehension in prescribed Marine Corps records. If there is a duty to record that fact in those records, an entry in the service record is appropriate. I would, therefore, answer the question certified by The Judge Advocate General of the Navy in the affirmative and affirm the findings made by the trial court.