UNITED STATES, Appellee

v.

ALBERT KITCHEN, Airman Third Class, U. S. Air Force Appellant

5 USCMA 541, 18 CMR 165

542

No. 4835

Decided March 18, 1955

COL A. W. Tolen, USAF, MAJ John J. Ensley, USAF, and CAPT Lee G. Norris, USAF, for Appellant.

LT COL Emanuel Lewis, USAF, LT COL Harold Anderson, USAF, and MAJ William G. Carrow, III, USAF, for Appellee.

## Opinion of the Court

PAUL W. BROSMAN, Judge:

The accused here was tried by a general court-martial convened at Amarillo Air Force Base, Texas, under a specification alleging that, on or about April 3, 1953, he had absented himself from his organization without proper leave and with intent to remain away permanently, and had remained absent in desertion until apprehended on or about November 6, 1953—in violation of the Uniform Code of Military Justice, Article 85, 50 USC § 679. The accused pleaded guilty to the lesser included offense of absence without leave—in violation of Article 86 of the Code, 50 USC § 680. However, the court found him guilty as charged, and sentenced him to receive a dishonorable discharge, as well as to confinement at hard labor for two and a half years, and to total forfeitures.

The convening authority affirmed the findings, but suspended the dishonor-

able discharge; reduced the confinement to one year; and—pending the completion of appellate review—assigned the accused to the 3320th Retraining Group, located at the station at which trial was held. A board of review disapproved that portion of the findings which related to apprehension, but otherwise affirmed them and the sentence as well. We granted review to determine whether—in light of the Government's evidence, and the law officer's instructions—the finding of guilty of desertion was lawfully affirmed by the board.

## II

The evidence for the Government consisted of three morning report extract copies—and no more. The first of these established that the accused absented himself without leave on the morning of April 3, 1953, while en route from Sampson Air Force Base to Amarillo. The second extract came from an Air Police Squadron at Selfridge Air Force Base, Michigan, and stated:

"KITCHEN ALBERT AF 16430217 A3c W REGAF 99015 99016 PLN TOE unk YOB unk EOS No (No Deferement) [sic] FSSD unk DOS unk DFR of 3661st BMT Sq Sampson AFB NY par 4 SO 214 Hq 575th AD Gp tng code Y is asgd & jd PNFD conf base guardhouse ret to mil con (*in-vol*) 0230 hrs 6 Nov 53 at 5106th ASU MP Det Detroit Mich Auth AFR 35–73." [Emphasis supplied.]

Prosecution Exhibit 3 represented an entry correcting the second morning report to reflect that the accused had been dropped from the rolls at Amarillo Air Force Base, and not from those of the "3661st BMT Sq Sampson AFB NY."

The only evidence for the defense came from the accused himself. He denied an intention to absent himself permanently from the Air Force. According to him, his extended absence was occasioned by difficult family circumstances, which he described, and which—in his view—necessitated his presence at his home in Detroit, Michigan. He asserted that in September 1953 he had presented himself at the Recruiting Office located in the Federal Building in Detroit, and had reported to a staff sergeant on duty there that he was absent without leave from the Air Force. The sergeant set down this information from Airman Kitchen in a memorandum, and stated that the latter would shortly be notified of arrangements for his transportation to Amarillo Air Force Base. The accused then "went back home," and "About a month and a half *after I turned myself in*, the M.P.'s came out and picked me up." (Emphasis supplied.) According to the accused, all of his Detroit acquaintances knew him to be a member of the Armed Services—and for a considerable period during the absence in question he wore his Air Force uniform.

## III

In two previous cases we have considered the establishment of a deserter's apprehension by means of entries in official military records. In United States v. Coates, 2 USCMA 625, 10 CMR 123, we held that—in light of existing Navy Regulations—an entry in the accused's service record to the effect that he had been apprehended was admissible and legally sufficient to establish the fact recited. However, in United States v. Bennett, 4 USCMA 309, 15 CMR 309, we examined pertinent directives of the Marine Corps and determined that—as they were phrased at the time of Bennett's return to military control—there existed no official duty to record the fact of apprehension in an absentee's service record, and therefore that such a recital was neither admissible nor legally sufficient to support such a finding.

In both of the cited cases we referred to Army and Air Force board of review opinions which had refused to sustain findings of apprehension based solely on morning report entries. We emphasized in Bennett, however, that it was distinctly open to these services to alter their personnel accounting directives, if they desired a result conformable to that reached in Coates as to the Navy. It appears that action of this nature has now been taken by the Air Force—for we observe that AFM 171–6, paragraph 23$g$(3), as revised in April 1954, requires that, on the return to

military control of one dropped from the rolls following an unauthorized absence, the morning report entry shall include a statement as to "whether the person returned voluntarily or was *apprehended* (as applicable)." (Emphasis supplied.) Cf. SR–335–50–1, dated August 6, 1954, paragraphs 63, 64. Previous directives, however, required only an entry as to "whether the person returned voluntarily or was returned (as applicable)." See AFM 171–6, paragraph 23*i*(3), June 1950. And Air Force boards of review have repeatedly held that a morning report entry recording "involuntary" return—within the meaning of the earlier directive—did not necessarily equate to "apprehension," within the meaning of the Manual for Courts-Martial. See United States v. Pierce [ACM 7798], 13 CMR 911. Therefore, this entry could not sustain a finding of apprehension.

### IV

However, while a morning report entry showing an involuntary return might not be sufficient ▪ legally to establish the apprehension alleged, it does not follow that it is inadmissible on the basis of the hearsay rule. This is true because—as revealed clearly by the applicable personnel accounting directive—the entry was made pursuant to an official duty, in the same manner as that considered in Coates. The issue of admissibility thus centers on the relevance and materiality of this evidence.

The interpretation of the difference between "voluntary" and "involuntary," within the framework of the original AFM 171–6, is to some extent unclear to us. However, use of the latter term must at least be taken to negate the possibility that an absentee surrendered directly to representatives of the military establishment. Since such a surrender constitutes means typically resorted to by those absentees desirous of returning to the military service, we are sure that a morning report reference to the manner of return as "voluntary," or the converse, would be relevant to a determination of the intent required for a finding of desertion. Moreover, if apprehension were alleged, and if other evidence were adduced bearing thereon, a morning report recital of involuntary return would be relevant either to corroborate the Government's case or to refute the defense's contentions. It is the latter possibility which is involved in the case at bar—and in view of this, we have no doubt that the law officer did not err in permitting the court to consider the challenged evidence.

The accused maintained in sworn testimony that in September 1953 he informed a staff sergeant in ▪ the Air Force Recruiting Office in Detroit that he was in a status of absence without official leave. A staff sergeant is a noncommissioned officer of the Air Force. Therefore, he is authorized to apprehend one subject to the Uniform Code on a reasonable belief (1) that an offense has been committed, and (2) that the person apprehended had committed it. See Uniform Code of Military Justice, Article 7(*b*), 50 USC § 561; Manual for Courts-Martial, United States, 1951, paragraph 19*a*. According to the Air Force regulation governing absence without leave and desertion, "when an absentee or deserter surrenders to, is delivered to, or is apprehended by any agent of the Armed Services authorized to apprehend absentees or deserters, his period of absence is terminated." Paragraph 18, AFR 35–73, dated May 19, 1953; see also paragraph 4(h). A report by an absentee in person, to a noncommissioned officer authorized to apprehend, to the effect that the former is absent without leave would, we are sure, constitute here a "surrender," within the meaning of paragraph 18, AFR 35–73. Therefore, the accused's absence, which began in April 1953, appears to have terminated in September of that year, rather than in November— if his sworn testimony is to be believed. Of course—and conceding the truthfulness of his story—the accused's failure to take further steps after speaking with the staff sergeant at the Recruiting Office may conceivably, and under some circumstances, have served to initiate a new period of absence without leave. United States v. Green [ACM 2130], 2 CMR (AF) 523; United States

v. Henderson [ACM 1979], 2 CMR (AF) 390. Cf. United States v. Jackson, 1 USCMA 190, 2 CMR 96.

If the accused's testimony be regarded as truthful, and if he in fact "surrendered," then the mode of return from the absence which began in April was voluntary. It follows that the only manner in which his statements may be reconciled with Prosecution Exhibit 2 involves the assumption that the absence referred to in *that* document was a second absence—that is, one which began after he had "turned in" at the Recruiting Office. Yet it is perfectly clear that this assumption finds no vestige of support in anything appearing in the record of trial or, for that matter, among allied papers. Indeed, internal evidence supplied by the Exhibit itself, together with certain provisions of Air Force personnel accounting directives,[1] points in a wholly contrary direction. In short, we entertain no doubt that Prosecution Exhibit 2 related solely to the absence of the accused which began in April 1953. And we are sure that its inconsistency with the accused's testimony, having to do with the absence's termination, fully authorized the consideration by the court-martial of the extract copy in its entirety.

## V

It is certainly conceivable that the members of the court-martial could have disbelieved the accused's assertion that he had revealed his identity and his status of unauthorized absence to an Air Force noncommissioned officer in September 1953. At the same time, they might have accepted his less self-serving testimony to the effect that in November military police came to his home and "apprehended" him. The accused's statement as a witness might also support the inference that he had been taken into military custody as an absentee—and for no other cause. Accordingly it has been suggested that the record of trial was clearly sufficient to support the court-martial's finding of apprehension.

There seems little point in exploring this area, however, in light of the action of the board of review in this case in setting aside the finding of apprehension, and the presence of a serious error which compels reversal in any event. Similarly, we are not required to deal

---

[1] According to paragraph 17(b) of AFR 35–73, one who has been absent without leave for more than thirty days shall—on return to military control—be assigned to an appropriate unit at the station where the return occurs. It follows that, if the accused had surrendered at the Detroit Recruiting Station in September 1953 and thus had terminated the unauthorized absence which had begun in April, he should in due course, have been asigned in September to a nearby installation—doubtless Selfridge Air Force Base—until further disposition could be arranged. If, pending such disposition, he absented himself once more, this new absence would have been reported as beginning at Selfridge, rather than at either Amarillo or Sampson Air Force Base. Cf. United States v. Cantrell [ACM 4993], 5 CMR 823, petition for review denied, 2 USCMA 674, 5 CMR 130. However, the morning report entries reflecting termination of the absence on November 6, 1953, are not consistent with this state of affairs. Moreover, if the accused had been added to the morning report of an installation in the Detroit area, and later had been dropped from the rolls because of a second absence—that is, one from the latter base—it would be probable that the "number of days or months in dropped status," by reason of the second absence, would have been known to the official preparing Prosecution Exhibit 2. If known, such information should, under appropriate directives, have been incorporated in the morning report. See AFM 171–6, chapter 3, paragraph 23$i$(3). In short, it is clear that, insofar as Air Force personnel accounting records are concerned, the absence of the accused which terminated "involuntarily" on November 6, 1953, was the selfsame absence which began in April of that year. Yet, if the accused's testimony is to be believed, that absence had terminated voluntarily in September 1953. It was not error to permit the members of the court-martial to consider this inconsistency in their deliberations. However, whether the court should have been specifically advised—under the peculiar circumstances of this case—that "involuntary" could not be equated with apprehension, we do not decide.

with the contention that the instructions of the law officer concerning apprehension carried fatal flaws.[2]

## VI

Inchoate in what has preceded, however, is recognition of a highly prejudicial error made by the ■ law officer. As we analyze the accused's testimony, noting that it was presented *prior to* findings, he maintained that the period of absence charged against him ended in September and not in November as alleged—and ended moreover by surrender. Yet Airman Kitchen had previously entered a plea of guilty, through the use of exceptions and substitutions, to an absence extending from April to November 1953. Under these circumstances it is manifest that the law officer should have withdrawn the plea of guilty, as originally entered. Uniform Code, Article 45(a), 50 USC § 620; Manual for Courts-Martial, paragraph 70a. Instead, he permitted the plea to remain in effect, and thereafter specifically informed the court that the plea of guilty to absence without leave left "in issue only the element of his intent to remain absent permanently."

On its face, and at the very least, this instruction is dangerously ambiguous, since it might easily be misconstrued to mean that the accused had pleaded guilty to the allegation of apprehension. Taking the instructions as a whole, however, the chance of misconstruction is reduced. Yet it is impossible to fail to recognize that the law officer's instructions, plus his failure to withdraw the guilty plea, added—as a matter of law—approximately one and one-half months of unauthorized absence to that conceded by the accused in the course of his testimony. If there is any content of meaning in our statement in United States v. Peterson, 1 USCMA 317, 3 CMR 51, that in the area of desertion "the presence or absence of facts—or perhaps even of a single fact—may lead to divergent results," we must find prejudice to the accused in the error here.

## VII

We cannot avoid adding that in the present case there can be little incentive to resolve doubts in favor of the Government in view of the doubtful quality of the preparation of the case by its counsel.[3] That official had been informed through written and highly proper suggestions prepared by the staff judge advocate to the convening authority that "to show the time, place, and manner of apprehension, it will be necessary to take a deposition . . . unless this could be made a matter of stipulation between prosecution, defense, and the accused." There was no stipulation, no deposition, and nothing whatever in the allied papers to indicate that any sort of effort was made to obtain either—a circumstance suggesting that the Government's attorney gave

---

[2] The law officer did not inform the court of the limited legal effect of the morning report entry. On the contrary, there is certainly some risk that, consistent with his instructions, the court concluded that apprehension was established by the morning report entry itself As to apprehension the law officer advised:

"The term 'apprehended' as used in the Specification imports that the accused was taken into custody by proper authorities without voluntarily surrendering himself in good faith to the custody of such authorities for the purpose of being returned to military control."

This is a "form instruction" used chiefly to cover the situation found when an accused is in the custody of civilian authorities because he has committed a nonmilitary offense, and in which there is some basis for a finding that he had disclosed his absentee status for the purpose of avoiding civilian prosecution. Cf. United States v. Beninate, 4 USCMA 98, 15 CMR 98; United States v. Nickaboine, 3 USCMA 152, 11 CMR 152. It has been suggested with some show of propriety that this instruction must have misled the court-martial members in the present case—which, of course, presented no problem of arrest of the accused by civilian officials—by impliedly impugning the accused's good faith in surrendering at the Recruiting Office.

[3] In point of fact, it was the assistant trial counsel who tried the case—the trial counsel being absent. Our remarks, of course, relate to the former officer.

little heed to the advice of the staff judge advocate. Yet he proceeded to trial under the original specification, despite the presence of that which should have indicated to him clearly the possibility of insufficient evidence to establish apprehension.

We are also unaware of what, if anything, the trial counsel later believed the record of trial to contain which might form the predicate for a finding of apprehension—this for the reason that he did not choose to offer any sort of final argument to the court-martial. Nor did he seek at all by cross-examination of the accused to establish circumstances which might sustain such a finding. Defense counsel, on the other hand, urged strongly in his closing argument that the evidence was insufficient to show apprehension—the presence or absence of which would be relevant to the issue of the accused's intent. Examining the performance of trial counsel as a whole, we must confess to disappointment in finding so casual an attitude displayed by one who had been certified pursuant to Article 27 of the Uniform Code. Indeed we would be reluctant to affirm any conviction of desertion following on so inadequate a presentation by the Government. Cf. Holland v. United States, 348 US 121, 99 L ed —, 75 S Ct 127.

### VIII

In light of the foregoing, a rehearing is ordered. In the alternative, of course, it is open to the board of review to affirm appropriate findings of guilty of absence without leave and to reassess sentence.

Chief Judge QUINN concurs.

LATIMER, Judge (dissenting):

I dissent.

There are at least four fundamental legal misconceptions in the Court's opinion, and, while they do not justify elaboration, they should be highlighted for future consideration. First and foremost is the holding that the law officer should have sua sponte withdrawn the plea of guilty. Apparently I take a tighter view of pleas of guilty than do my associates, but in my opinion they have a solemnity, dignity, and degree of finality which ought to prevent their being discarded on the slightest pretense or provocation. Most courts require a showing that the plea was inadvertent and at least some assertion that the accused has a defense to the crime he admits before action is taken. An accused has no right to withdraw a plea of guilty, Richardson v. United States, 217 F2d 696, 699 (CA 8th Cir 1954), and "there is no reason for the adoption of a soft and complacent attitude toward permitting the withdrawal of such pleas." Friedman v. United States, 200 F2d 690, 696 (CA 8th Cir 1952). In the military, as in the civilian sphere, every self-serving statement made by the accused in extenuation, presented in a light most favorable to him, should not require a law officer at his peril to gamble on the finality of the plea. Here the accused was represented by counsel, and he is presumed to know the nature of the charge to which the plea is entered. In line with tactics quite often employed in this type of case, a plea of guilty to absence without leave was entered. The morning report was competent evidence to support that plea. The maximum sentence of confinement which could be imposed for that offense was six months. As a practical matter, defense counsel undoubtedly knew he could not hope to avoid a conviction for desertion unless he put the accused on the stand, and knew that if the accused testified he could not avoid judicially admitting the absence without leave. If, as my associates contend, the law officer must withdraw the plea, he prejudices the accused by placing him in the unfortunate situation of being guilty of two offenses of absence without leave. While the record is not sufficiently clear to indicate the exact date the accused is supposed to have terminated the first absence, it is possible that each period could be in excess of three months. By that method of operation, the law officer could have placed the accused in the uncomfortable situation of serving twice as long as he would under his plea of guilty. But more than that, what happens now? In the event of

548

a rehearing, does the Government charge two consecutive absences without leave? And, is the accused bound by our unwarranted assumption that he intended to return to military control and thereafter committed a second offense? If so, the man loses by this appeal. I can well understand why no one raised this unique question. But what I cannot understand is why this Court, without solicitation, seizes upon such an idea to support its conclusion.

Second, we have previously ruled on return to military control, and I find difficulty in reconciling those cases with the principles herein announced. The accused does not contend that he was in uniform and prepared to again resume his obligations to the service. He was not prepared to turn himself in at a military installation and he did not testify he had any intent, at that time, to return to a duty status. At best he merely dropped in at a recruiting station as it was closing up and informed some sergeant that he was absent without leave. He did not ask to be taken into custody or sent to a nearby installation, as he was contemplating his future activities. He wanted information as to the means and method of travelling a considerable distance to his home station. Of course, the sergeant could have invited him home for the night, but I believe the accused intended and did return to his own home. Furthermore, if I correctly interpret our decisions, I do not believe a recruiting sergeant must arrest a person on that person's uncorroborated admission; and if the rationale of the Court is sound, any admission of absence without leave by a person in uniform or out, to a staff sergeant, whether it be on the street corner, in a downtown office, or at a social gathering, is a return to military service. It is one thing to have the power to arrest, it is quite another to exercise it. To effect a return to military control in this case, I believe it must necessarily appear that the recruiting sergeant intended to, and did, establish some sort of control over the accused's future movements. I find no such showing in this case.

Third, although the opinion contains only an offhand reference to the insufficiency of the evidence to support a finding of apprehension, it should be noted that the accused himself admitted that the military police had come to his home and picked him up. This judicial admission is sufficient to support the finding and is also sufficient to raise the issue of apprehension as a basis for an instruction. The instruction given by the law officer was adequate. He defined apprehension as follows:

"The term 'apprehended' as used in the Specification imports that the accused was taken into custody by proper authorities without voluntarily surrendering himself in good faith to the custody of such authorities for the purpose of being returned to military control."

The court-martial was confronted with and instructed on all of the issues reasonably raised in this case, and I am, therefore, of the opinion that no prejudicial error occurred in that area.

Lastly, the majority opinion states:

"We cannot avoid adding that in the present case there can be little incentive to resolve doubts in favor of the Government in view of the doubtful quality of the preparation of the case by its counsel."

It appears to me that all doubts were removed by the findings of the court-martial, and they are amply supported by the record. But more than that, the only issue was intent and trial counsel primarily relied on prolonged absence. This Court has reviewed numerous records containing charges of desertion in which the preparation and presentation was not unlike that in this case. Documentary proof of the offense was submitted and, as in many instances, constituted the only evidence in the Government's case. We have, on numerous occasions, approved cases containing only that evidence. Here we have a judicial admission of the absence and the apprehension. I, therefore, see no reason to make an exception in this case.