UNITED STATES, Appellee

v

JOHNATHAN J. MORRIS (also known as JONATHAN J. MORRIS), Recruit, U. S. Army, Appellant

11 USCMA 16, 28 CMR 240

No. 12,969

Decided November 20, 1959

*First Lieutenant James G. Garner* argued the cause for Appellant, Accused. With him on the brief were *Major Edward Fenig* and *First Lieutenant Philip J. Miller.*

*First Lieutenant Avram G. Hammer* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel James G. McConaughy* and *First Lieutenant Renald A. Manetti.*

## Opinion of the Court

HOMER FERGUSON, Judge:

Tried by general court-martial upon a charge of desertion, in violation of Article of War 58, 10 USC (1946 ed) § 1530, the accused was found guilty of absence without leave, in violation of Article of War 61, 10 USC (1946 ed) § 1533. He was sentenced to dishonorable discharge, forfeiture of all pay and allowances, and confinement at hard labor for six months. Intermediate appellate authorities affirmed, and we granted accused's petition for review on the issue whether his conviction of absence without leave was barred by the statute of limitations.

On November 11, 1948, the accused absented himself without proper authority from his unit, 1st Signal Company, then located at Bad Toelz, Ger-

many. Accompanied by his paramour, he journeyed through Austria and Hungary to her home in Timisoara, Romania. There, he registered with police officials and was furnished identification papers as a stateless person. Subsequently, he was permitted to work and was employed in various capacities as an electrician and laborer. Commencing in 1951, he corresponded intermittently with the United States Legation in Bucharest concerning obtaining a United States passport and his desire to return to military control. At the request of Legation officials, he eventually appeared before a United State Vice Consul in Bucharest on February 18, 1956. That official, having satisfied himself that Morris was a United States citizen, issued him a passport and advised him to make arrangements with police officials in Timisoara for an exit visa in order that he might return to his military organization.

Accused returned to Timisoara and applied for permission to leave Romania. Although he apparently inquired from time to time concerning the status of this request, no apparent action was taken by Romanian officials. In September 1958, he was again granted permission to travel to Bucharest and visited the United States Legation for the second time. On this occasion, Legation officials requested that he remain. Permission was obtained from the Romanian Government for his departure from the country, and on September 16, 1958, he was returned to military control in Cologne, Germany. Sworn charges were apparently received by the officer exercising summary court-martial jurisdiction on an unknown date between October 8, 1958, the day on which accused was informed of the nature of the charges against him, and December 2, 1958, the day on which they were referred for trial. The appropriate certificate on the charge sheet was left unexecuted.

Code, supra Article 43, 10 USC § 843, prohibits the trial by court-martial of an accused for the offense of absence without leave in time of peace when committed more than two years before the receipt of sworn charges and specifications by an officer exercising summary court-martial jurisdiction over the command. However, subsection (d) of that Article also states that certain periods are to be excluded in computing the period of limitation:

"(d) Periods in which the accused was absent from territory in which the United States has the authority to apprehend him, or in the custody of civil authorities, or in the hands of the enemy, shall be excluded in computing the period of limitations prescribed in this article."

Article of War 39, 10 USC (1946 ed) § 1510, in effect at the time accused absented himself, provided an identical period of limitations for the prosecution of the offense of absence without leave but tolled the running of the statutory period during the "period of any absence of the accused from the jurisdiction of the United States." In the view we take of the case, the difference in the terminology utilized in the tolling provisions of the two statutes is immaterial. Hence, we need not decide whether the prosecution of the accused is governed by Article 43 or Article of War 39, both supra.[1] See, however, United States v Nichols, 2 USCMA 27, 6 CMR 27; and United States v Meyer, 1 USCMA 164, 2 CMR 70.

At the outset of his trial, accused pleaded the statute of limitations in bar of prosecution. As it was apparent that the statutory period had long since elapsed, it was incumbent upon the Government to demonstrate that the charges were in fact timely. United States v Shell, 7 USCMA 646, 23 CMR 110; Manual for Courts-Martial, United States, 1951, paragraph 68c. This the Government proceeded to do by showing that accused was residing in either Hungary or Romania from almost the

---

[1] There is no doubt that accused's absence must be considered to have commenced in time of peace. See Executive Order No. 9772, August 24, 1946; Joint Resolution of July 25, 1947 (Public Law 239, 80th Congress, 61 Stat 449).

18

time he departed from his unit until his return to military custody in 1958. Indeed, the accused concedes such to be the case and admits that, until February 18, 1956, he was both outside the jurisdiction of the United States and in a locale where it had no authority to apprehend him. See Article 43 and Article of War 39, supra. However, he argues that, upon presenting himself to the United States Legation on that date, he in effect surrendered himself or should have been apprehended by the Military Attaché. Hence, he contends that we should charge the Government with the consequences of its failure to take him into custody and hold that the statute commenced to run again on the mentioned date. He does not claim that his visit to the Legation constituted a return to the jurisdiction of the United States. Article of War 39, supra.

At the outset, we note that we are aware of no authority on the part of diplomatic personnel to apprehend or accept the surrender of military absentees in foreign countries. While more assistance might have been offered by the Vice Consul to the accused with reference to obtaining an exit visa, we are loath to convert this failure to take the best possible measures on accused's behalf to a constructive return to military control. Thus, if the accused is to prevail, it must be on the basis that he surrendered to the United States Military Attaché or that the Attaché should have taken him into custody. Here, however, his contentions again meet an insuperable obstacle, for the record shows only that he contacted a Vice Consul at the Legation. Although the Vice Consul appeared and testified, there is a significant silence on the subject of whether the Military Attaché was ever informed of the accused's presence or desires. Certainly, we cannot charge the Attaché with the duty of accepting a surrender or apprehending an absentee when he is not even shown to have known of the existence of the offender. Were we to reach such a conclusion, we would necessarily have to find in other cases that mere casual visits to a military reservation, unknown to those in authority, constituted a return to military control. This is not the law, and we are not inclined so to construe a simple visit to the United States Legation. See United States v Jackson, 1 USCMA 190, 2 CMR 96; cf. United States v Kitchen, 5 USCMA 541, 18 CMR 165. Thus, even if we assume the validity of each of the legal propositions advanced by the accused, we can afford him no relief for his claims are simply not supported by the evidence. Accordingly, we must conclude his prosecution was timely.

The decision of the board of review is affirmed.

Chief Judge QUINN and Judge LATIMER concur.