UNITED STATES, Appellee

v

WILLIE C. KEATON, Private,
U. S. Army, Appellant

18 USCMA 500, 40 CMR 212

No. 21,874

August 15, 1969

Captain Robert A. Savill argued the cause for Appellant, Accused. With him on the brief were Colonel Daniel T. Ghent and Major James M. Yelton, Jr.

Captain James L. Rider argued the cause for Appellee, United States. With him on the brief were Lieutenant Colonel David Rarick and Major Edwin P. Wasinger.

## Opinion of the Court

DARDEN, Judge:

Pursuant to his plea of guilty, the accused was convicted by a general court-martial at Fort Gordon, Georgia, for absence without leave, in violation of Article 86, Uniform Code of Military Justice, 10 USC § 886. He was sentenced to a dishonorable discharge, total forfeitures, confinement at hard labor for one year, and reduction to the lowest enlisted grade. In compliance with the terms of a pretrial agreement, the convening authority reduced the period of confinement to eleven

months. The board of review then reduced the dishonorable discharge to a bad-conduct discharge.

The record in this case shows that at the beginning of trial and before the entering of a plea, the defense moved for dismissal of the absence-without-leave charge, contending that there had been a denial of speedy trial. The attendant out-of-court hearing reveals that on March 1, 1968, Keaton had been apprehended by civil authorities in Leesburg, Florida, on an armed robbery charge. He was placed in the Marion County jail, Ocala, Florida, where he remained until March 14, 1968. On that day he was released on bail. His Army status was then unknown. On March 27, 1968, however, the accused was taken into custody by the Federal Bureau of Investigation as a military absentee and returned to the Ocala confinement facility. On March 29, 1968, a hearing was held on the robbery charge, with the case being continued until July 5, 1968. The accused returned to confinement.

During the out-of-court hearing, the trial counsel declared that the Jacksonville, Florida, Shore Patrol had been told of the accused's apprehension by the FBI, that this unit had received word of the civil hearing "the day . . . [that] case was postponed" and assumed that Keaton was being held on civil charges, and that some time in June they received a call from the defense counsel requesting that his client be picked up. According to the trial counsel, "this was the first word that they had of . . . [this] case." On June 25, 1968, the accused was released to the Jacksonville Shore Patrol and transferred to Fort Gordon, Georgia, two days later. On July 2, 1968, a *nolle prosequi* was entered on the State charge.

The counsel who had defended the accused on the State charge testified at the out-of-court proceeding that on March 27—after the accused was seized by the FBI as a military absentee and confined—appropriate notification was immediately given to the Jacksonville unit, including the release of the accused on bail as far as the

civil charge was concerned, that this charge had "no weight" and that an assistant State's attorney had indicated a *nolle prosequi* of the State case. It was also suggested that the accused be picked up so that military charges could be disposed of. The person with whom he talked assured him that the matter would be looked into. This same information was passed by the counsel's firm to both the Judge Advocate's office and the Provost Marshal's office at Fort Bragg, North Carolina.

A week or ten days later, the accused was still incarcerated at Ocala. His counsel then got in touch with the FBI. He was told that the military had jurisdiction. The Jacksonville office, when again called, promised to look into the situation within two or three days. Within that time, "military people" from Fort Stewart, Georgia, talked to Keaton, telling him that they would look into the matter and "check back with him." The accused nonetheless remained in jail under maximum security conditions. A subsequent call to Jacksonville resulted only in further talk with the accused. Finally, counsel was told that accused would be picked up the next day. He replied that if this was not done, he was prepared to file an application for writ of habeas corpus. The following day, June 25, 1968, the accused was taken into custody by the shore patrol. At trial the law officer ruled adversely on the defense motion to dismiss for lack of speedy trial.

On these facts, the accused's right to a speedy trial was placed in issue before the board of review. In holding adversely to the accused, that tribunal first noted "[t]he general rule in cases of this nature is that the accountability of the Government begins to run from the date an accused is restrained or from the date charges are preferred, whichever is earlier (Articles 10 and 33, UCMJ; U. S. v Callahan, 10 USCMA 156, 27 CMR 230 (1959) and later cases)." Their opinion, however, then counters with the assertion—citing United States v Williams, 12 USCMA 81, 30 CMR 81—that

501

"detention of an accused by civil authorities for a civil offense, before preferment of any military charge, cannot properly be charged against the Government as part of the time for which it is accountable in determining whether it acted with reasonable dispatch in prosecuting an offense."

Relying on their own research of Florida law, complemented by correspondence from the accused's bondsman indicating that his liability to the court did not change or cease until July 2, 1968, the board of review decided "[t]hese limitations on appellant's freedom of movement may be equated in law to detention of an accused by civil authorities for a civil offense for the period 1 March 1968 to at least 2 July 1968."

The board of review nonetheless then turned to the question of due diligence after assuming, without deciding, that the period of Government accountability began on March 27, 1968. They found no evidence of any purposeful or oppressive design on the part of the Government to delay the trial. In so holding, the board of review emphasized that there is a sensitivity concerning jurisdiction between the military and civil community and that armed robbery is a serious offense judged by any standard, but absence without leave is a minor military offense. The board of review then ended their opinion with the following paragraph:

"We know of no rule of law imposing upon the Federal Government a duty to urge State authorities to expedite their disposition of a major State criminal offense in order to permit the Federal Government to try the person involved for an unrelated minor Federal offense, or to relieve a bondsman before a State court from the obligations of his bond. In the absence of any such rules of law, we are of the opinion that the Government emissaries acted reasonably in not insisting upon an earlier delivery of appellant to Federal control and that there was no violation of the rule requiring reasonable diligence in the prosecution of the Federal offense in this case. We so hold. The law officer did not abuse his discretion in denying appellant's motion to dismiss the charge on the ground of a lack of speedy trial."

The same issue now comes to this Court in the following form:

Whether the law officer abused his discretion in denying trial defense counsel's motion to dismiss the Charge and specification on the ground that appellant's right to a speedy trial was violated in that the Federal authorities deprived the appellant of his right to bail on a State criminal offense by causing the State officials to confine the appellant, who was at large on the State charge due to State bail provisions, for desertion and by allowing the appellant to be confined for 90 days thereafter without contacting State officials concerning the disposition of the State charges and without making any effort to have the appellant removed from the jurisdiction of the State for the purpose of trying him on the Federal charge.

Keaton's counsel argue before us that the Government should have made an effort to remove Keaton from Florida civil authorities soon after March 27, 1968. They cite United States v Garner, 7 USCMA 578, 23 CMR 42, to support their view that FBI apprehension for the armed forces constituted military control for the purpose of accountability for a speedy trial.

The decision of the board of review stresses that under Florida law Keaton's release on bail still amounted to civil detention because he was not at liberty to leave the State in this status. Cf. United States v Williams, 12 USCMA 81, 30 CMR 81. Appellate defense counsel point out that under Florida Rules of Criminal Procedure the Florida court could have granted leave for Keaton to depart the State. Rule 1.130*d*, Florida Rules of Criminal Procedure, 33 Florida Statutes Annotated, § 903.12.

Irrespective of whether *Williams* is apposite, we are urged that under Smith v Hooey, 393 US 374, 21 L Ed 2d 607, 89 S Ct 575 (1969), the defense counsel's efforts to have the armed forces remove Keaton from Florida was the equivalent of a request for trial and that the denial requires dismissal of the charges on constitutional grounds.

Responding to the inference in the opinion by the board of review that the failure of the armed forces to act may have been a result of respect for Florida's jurisdiction, the appellate defense counsel invite attention that Keaton was removed from Florida before the State entered a *nolle prosequi* of its charge but only after he had threatened to file a petition for writ of habeas corpus.

This case, we believe, should be decided more on the basis of *Garner* than *Williams*.

In United States v Williams, supra, that accused was arrested in August 1959 by Georgia authorities and held for trial on a vagrancy charge. While incarcerated, he admitted to a visiting Air Policeman that he, too, was a member of the Air Force. Civil authorities tried the accused in September 1959, releasing him to the military on October 9, 1959. While under "some sort" of military restraint on that date, he was not confined at his home station, Keesler Air Force Base, Biloxi, Mississippi, until October 27. Tried by the Air Force for desertion, he unsuccessfully moved for dismissal of the charge because of an asserted lack of speedy trial. Defense argued that the Government was accountable from the time it learned Williams was an unauthorized absentee detained by military authority. Although it was assumed *arguendo* that October 9 was the critical date, the Court observed, as previously noted, that civilian detention for a civilian offense before military preferment of charges was not chargeable to the latter in determining the reasonableness in prosecution of the military offense. October 9 did not fix the date of the period in issue,

for "military control is a wholly neutral circumstance." Confinement or presentment of charges, whichever occurs first, determines the beginning. That the Court's holding was applicable only to detention of an accused by civil authorities for a civil offense, before preferment of any military charge, is evidenced not only by the facts of that case but also by the immediate reference to *Garner*.

In comparison, the accused in United States v Garner, supra, was tried for two offenses, one being an unauthorized absence for the period November 1 to December 1, 1955. A plea of guilty was entered—but rejected as irregular —to an absence ending November 23, 1955, the date that Garner was apprehended as an absentee by a Tennessee deputy sheriff *for the Department of Defense*. Although military authorities were immediately informed, he remained in the county jail until December 1, 1955. Considering the ruling by the law officer concerning the materiality of the sheriff's deposition, the Court rejected the Government's contention that only actual physical control over the accused "in a situation like that present" terminated the accused's absence and liability to punishment for that offense. This conclusion, however, was founded not upon constitutional concepts of due process or speedy trial but on statutory construction, because "Congress has directed that there be no 'unnecessary delay' in the disposition of a court-martial case," citing both Articles 33 and 98 of the Uniform Code of Military Justice, 10 USC §§ 833 and 898. (See also Article 10, Code, supra.) A majority of the Court agreed that:

"Military control can be exercised directly by military personnel, or, for certain purposes, indirectly, by civilian officials acting for and on behalf of the Armed Forces, Reid v Covert, 351 US 487, 100 L Ed 1352, 76 S Ct 880 (1956), rehearing granted on another ground 352 US 813, 1 L Ed 2d 92, 77 S Ct 123. . . . A detention effected in accordance with such a notice is a detention on behalf of the military and under

the authority granted by Congress for that purpose." [7 USCMA, at page 582.]

These views apply to the instant proceeding. We hold, therefore, that the beginning date for determining whether Keaton received a prompt trial is March 27, 1968, the day that he was confined in behalf of the Federal Government pending court-martial charges, even though he was held on bail by State authorities pursuant to State charges.

Smith v Hooey, supra, is appropriate to only a limited degree, the Supreme Court having determined only that a State has a constitutional duty, upon the petitioner's demand, to make a diligent, good-faith effort to bring him to trial, even though he was serving a term in prison elsewhere. To that extent, by a "parity of reasoning" it is pertinent to the case at bar. The Supreme Court in Smith v Hooey, supra, did not, however, then entertain and resolve the merits of the speedy trial question implicit in the decided issue. The Court did not dismiss the State charge for want of speedy trial. In contrast, the Army did act against Keaton by trying him for an offense under the Uniform Code of Military Justice.

The interval from March 27 to June 25, 1968, represents an almost three-month period of total inaction by the Government in pursuit of its cause. It is a delay, we believe, born of the mistaken belief that so long as the State charge had not been finally disposed of the Government was under no obligation to inquire whether it could reassert control over Keaton. The frequent requests from Keaton's counsel that the Government attempt to remove Keaton from the Ocala jail were sufficient notice that the Government had the burden at least to inquire officially whether the State would relinquish custody. That these requests were unheeded for the long period mentioned earlier is enough for us to decide that the requirements of Articles 10, 33, and 98 of the Uniform Code were not met. Obviously, the appellant has suffered from the delay and in the presence of prejudice his conviction may not stand. Cf. United States v Parish, 17 USCMA 411, 38 CMR 209; United States v Goode, 17 USCMA 584, 38 CMR 382; United States v White, 17 USCMA 462, 38 CMR 260; United States v Weisenmuller, 17 USCMA 636, 38 CMR 434. The granted issue is answered in the affirmative. Accordingly, the decision of the board of review is reversed.

At least to the author of this opinion, the dismissal of the Charge of an extended unauthorized absence is a drastic and unsatisfactory method for dealing with inattention or lack of diligence by some members or employees of the armed forces. In the absence of any intermediate remedy and since the only apparent alternative is to affirm the conviction, the record of trial is returned to the Judge Advocate General of the Army and the Charge is ordered dismissed.

Chief Judge QUINN and Judge FERGUSON concur.