UNITED STATES, Appellee

v

RICHARD S. HALE, Second Lieutenant,
U. S. Army, Appellant

20 USCMA 150, 42 CMR 342

No. 22,974

November 20, 1970

*Captain Paul C. Saunders* argued the cause for Appellant, Accused. With him on the brief were *Colonel Daniel T. Ghent* and *Captain Monte Engler*.

*Captain Richard K. Bank* argued the cause for Appellee, United States. With him on the brief were *Colonel David T. Bryant, Captain William R. Steinmetz,* and *Captain Benjamin G. Porter*.

## Opinion

FERGUSON, Judge:

The accused was convicted of one specification alleging conduct unbecoming an officer and a gentleman, in violation of Article 133, Uniform Code of Military Justice, 10 USC § 933. His sentence to total forfeitures and dismissal from the service remains unchanged at this level. We granted review on the following issues:

1. Whether the evidence is legally sufficient to sustain the findings of the court-martial.

2. Whether the military judge correctly advised the accused of his rights to counsel in conformity with Article 38(b), Uniform Code of Military Justice, 10 USC § 838.

The specification alleging the offense of conduct unbecoming an officer and a gentleman is as follows:

"In that Second Lieutenant Richard Seth Hale, US Army, Battery C, 1st Battalion, 6th Artillery, 1st Armored Division (Old Ironsides), Fort Hood, Texas, having received Department of the Army Special Order Number 195, dated 4 October 1967, assigning him to the United States Army, Vietnam, Transient Detachment, APO San Francisco 96375, for further assignment to I Field Forces, Vietnam, APO San Francisco 96238 with an availability date of 8 March 1968, departed on leave on or about 28 January 1968 and after said leave expired on 11 March 1968, did thereafter dishonorably fail to return to military control until on or about 6 March 1969, and that under the circumstances, his continued absence constitutes conduct unbecoming an officer and gentleman."

The facts are not in dispute as evidenced by a stipulation of fact (Prosecution Exhibit One) introduced at trial with consent of the accused and his counsel:

"1. LT Richard S. Hale departed Fort Hood, Texas on 28 January 1968 on a 30 day leave in possession of DA Special Order Number 195, dated 4 October 1967, assigning him to the United States Army, Transient Detachment, APO San Francisco 96375, for further assignment to I Field Force, Vietnam, APO San Francisco 96238 with an availability date of 8 March 1968.

"2. On departing Fort Hood, Texas, LT Hale had not received port call orders and was instructed he would receive them at his home address.

"3. On departure from Fort Hood, Texas, LT Hale went to Prescott, Arizona where he resided with his parents, awaiting port call orders, until 6 March 1969.

"4. Between 28 January 1968 and 6 March 1969 LT Hale never contacted or entered a military post or installation, other than calling his former roommates on 8 and 9 March 1968 to inquire about his port call orders and going on 1 March 68 to the Finance Office, Luke Air Force Base, Phoenix, Arizona, to draw his January '68 and February '68 pay.

"5. On 6 March 1969 LT Hale voluntarily returned to Fort Hood, Texas and reported in uniform to III Corps SJA office stating he had never received port call orders."

This, together with a copy of Department of the Army Special Order No. 195, a part of Prosecution Exhibit One, was the total evidence submitted by the Government in this case:

"SPECIAL ORDERS ⎱ HEADQUARTERS,
 ⎰ DEPARTMENT OF THE ARMY,
No. 195 Washington, D. C., 4 Oct 67

### EXTRACT

*Symbols:* DP—By direction of the President

TDN—Travel directed is necessary in military service

WP—Will proceed to

ACPATT—All commands through which this shipment passes will process these personnel (this individual) as attached

AD—Active duty

EDCSA—Effective date of change of strength accountability

DDALV—Days' delay en route auth chargeable as lv

DDALVAHP—Days' delay at home or leave address within the continental United States authorized chargeable as leave provided it does not interfere with reporting date specified. Advanced lv may be authorized where necessary

DALVP—Delay en route authorized chargeable as ordinary lv provided it does not interfere with reporting on date specified and providing individual has sufficient accrued lv

PPSIA—Pamphlet—"Personal Property Shipping Information" is applicable

TDHHG—For travel of dependents authorized transportation of household goods including packing and crating and unpacking and uncrating

HOSTWOY—Home of selection and completion travel within one year is authorized

\* \* \* \*

113. TC 240. Fol rsg dir. PRAP AR 55–28. WP. TDN. Indiv will send msg ntfy to CGUSARV advising of ch in ETA when trans scd are ch at transshpmt or stopover pt fol dprt fr CONUS. Such msg WB given to CO of mil instl enr for xmsn. An ex bag alw of 134 lbs personal eff auth to acmp each indiv while tvl by acft. Cner tvl of depn and shpmt of POV not auth. Indiv will arr in Vietnam wearing khaki trousers and short sleeve shirt and will have in poss basic rqr khaki unif fatigues and cbt boots. Army tan and green unif opt for offs only. Dress unif not rqr. Summer civ clo desirable for off-duty wear. UP par 11 AR 40–562 plague imm are rqr; tvl need not be delayed except for the first vaccine dose. Indiv needing corr eye lenses WB equipped with mask protective fld M 17 and nec corr eye lenses prior to dprt fr CONUS. The introduction pur and poss of privately owned wpn is prohibited in the Republic of Vietnam. Asg to USARV Tran Det, APO San Francisco 96375 for asg as indic (UNOINDC). Lv data 30 DDALVAHP UNOINDC. PCS (MDC) ZZ. Acct clas 2182010 01–4411–4412–4413–4414–4415–4416–4417 P 1444 S99–999. CIC 281A01. EDCSA to be estb.

\* \* \* \*

FITZGERALD, TERENCE M., 05426497 2LT, Arty 1193 Btry B 1st Bn 6th Arty 1st Armd Div, Ft Hood, Tex 76545. Aloc Mar–0880 (IDC–4). Fur asg 23d Arty Gp APO San Francisco 96289. Aval date 11 Mar 1968.

\* \* \* \*

HALE, RICHARD S., 05426505 2LT Arty 1193 Btry C 1st Bn 6th Arty 1st Armd Div, Ft Hood, Tex 76545. Aloc Mar–0874 (IDC–1). Fur asg I FFORCEV APO San Francisco 96238. Aval date 8 Mar 1968.

\* \* \* \*

BY ORDER OF THE SECRETARY OF THE ARMY:

HAROLD K. JOHNSON,
*General, United States Army,*
*Chief of Staff.*

OFFICIAL:

KENNETH G. WICKHAM,
*Major General, United States Army,*
*The Adjutant General.*

'A TRUE EXTRACT COPY'

/s/ [illegible signature]
for DONALD J. WITBRODT
Captain, AGC
Asst AG

*DISTRIBUTION:*

1—Post Locator
1—Postal Sec 1st Armd Div
2—AG–PM (PC) 2–AG–MA
2—Officers Records
3—ea unit (For Mil Pay Purposes)
10—2LT HALE Btry C 1st Bn 6th Arty
10—2LT FITZGERALD Btry B 1st Bn 6th Arty
5—CG 1st Armd Div ATTN: Gl

*SPECIAL DISTRIBUTION:*
2—Post Billeting
ATTN: Mrs. Armour
*FOR MORNING REPORT PURPOSES:*
5—Btry B 1st Bn 6th Arty
5—Btry C 1st Bn 6th Arty."

A defense motion for a directed verdict of not guilty, based on insufficiency of the evidence, was denied.

The accused testified, under oath, that he received his orders to Vietnam and nothing else. He was told to go home and wait for his port call; however, he never received a port call. Other than his orders and instructions to go home, he received no other orders. While at his home in Prescott, Arizona, he did not conceal the fact that he was on orders but, in fact, let it be generally known. He went to Luke Air Force Base at the end of February to pick up his January and February pay. He did not draw any more pay because he did not need it and he thought it would be settled when he arrived in Vietnam. He did not believe he was doing anything wrong. He was prepared to go at the slightest bit of notification. In March 1969, becoming concerned because his normal date of separation from the service was only a month away, he spoke with a lawyer, a patron of his father's motorcycle shop. A junior member of the firm, with previous military legal experience, contacted a colonel in the military. According to the accused, the colonel advised that he return to Fort Hood immediately. He flew to Fort Hood the following day. Except for the calls to his former roommates, he made no inquiry about his port call. While at home he considered himself to be a part of the military. When questioned by trial counsel as to whether he understood his orders, the accused replied:

"The way I understood them, sir, is that I was suppose [sic] to go home and wait for a port call and that is about all I understood. I understood the military would contact me."

He believed it very possible that the Army would cancel the year that he was away, extend his date of separation, and send him to Vietnam because

154

he still had a year to serve. He had never received any formal instructions as to what an officer is supposed to do when he does not have any orders. The first realization that he had done anything wrong was when he was placed under charges.

A Sergeant First Class of the accused's battalion, who handles the port calls for officers, verified that he told the accused he would receive a port call through the mail at his home. That was the standing operating procedure in effect at that time. Due to a subsequent change, the orders themselves now contain the statement that if a port call is not received, the officer is to call and determine what he is to do. Lieutenant Hale's orders did not contain this direction, nor could the Sergeant recall whether he instructed the accused what to do.

A mobile home dealer in Prescott, Arizona, a community of about 16,000 people, and a local police officer, both former servicemen, testified that they were aware that Lieutenant Hale was awaiting a port call for Vietnam. In fact, it was common knowledge in this small community. During the entire period, the accused worked with his father who operates a motorcycle dealership. Both witnesses are motorcycle enthusiasts, and, as a result, became well acquainted with Lieutenant Hale. In December 1968, the accused declined to serve as president of a local motorcycle club as he expected to be called away at any time. The local police department has a card file on every resident of Prescott. The accused's file contains only his name—no derogatory information. The police officer, concerned over the delay in the accused's port call, caused an official check to be made to determine whether the accused was absent without leave. The reply was negative.

The accused's mother and father both testified that they were aware that he was awaiting a port call. His mother had changed his insignia on his uniforms and had helped him to pack. Everything was ready to go waiting the port call. His father, an Air Force veteran of ten-years service, including duty in World War II and Korea,[1] had talked with him about the delay. The father felt that the call had been set back because of the peace talks. Both parents testified that at no time did the accused indicate a desire not to go to Vietnam. The father also testified that his brother, a Navy Lieutenant (senior grade), had also seen a copy of the accused's orders and understood no more about it than did Mr. Hale. The brother did not recommend any further action.

The prosecution's theory at trial is perhaps best summed up in the following portion of trial counsel's argument to the court:

". . . Now, I ask you if you can say that Lieutenant Hale adhered to what is honorable? Has he conducted himself so that his personal integrity and his integrity as an officer and a gentleman has not been compromised? Would an honorable officer and a gentleman do what Lieutenant Hale did in waiting for one year for port call orders particularly after he called and by word of mouth found out that there was something wrong and particularly when he stated that he did not really understand his orders? It would seem that an honorable officer and a gentleman would take some initiative to ascertain what his orders said and some action to contact the military and inform them of the situation. But the evidence shows that Lieutenant Hale did nothing."

The defense, in general, contended that the Government had failed to prove beyond a reasonable doubt that the conduct of the accused was dishonorable. As defense counsel argued:

". . . True, it may have fallen a little short of what the most pru-

---

[1] The accused's father piloted fifty-six combat missions during World War II. He was a tow target pilot and aircraft controller during the Korean conflict.

dent officer would have done but was his conduct while away unbecoming an officer and a gentleman?"

It is difficult, at the outset, to determine exactly what type of offense is encompassed in the charge. Because of the use in the specification of words reflecting that the accused "did thereafter dishonorably fail to return to military control . . . and . . . his continued absence constitutes conduct unbecoming an officer and gentleman," the essence of the accused's conduct appears to charge an absence without leave. This possibility, however, was foreclosed by the law officer's ruling during the trial that "as a matter of law Prosecution Exhibit 1 does not establish an absence without leave." Rather, he suggested, the failure of the accused to take positive steps to secure a port call possibly constituted a "dereliction of duty type of thing." In his instructions on sentence he so informed the court members. With regard to the maximum imposable punishment, he stated:

". . . Now, if an enlisted man had been found guilty of being derelict in the performance of his duties the maximum punishment would be confinement to hard labor for three months and two-thirds forfeiture per month for three months. Now, the rule with regard to officers is that an officer convicted of any offense under the Code may be dismissed. The table of maximum punishments does not limit you with regard to the forfeitures you may impose. The only limitation in the book from the table of maximum punishments is that you may not give an officer confinement at hard labor for a period greater than could be given to an enlisted man under the table of maximum punishments. Therefore, under these circumstances I am instructing you that the maximum punishment you have available to you in this case is dismissal, total forfeitures, and confinement at hard labor for 3 months."

In the case at bar, the specification assumes that the accused was duty bound to *return to military control.* In order to have such a duty he must, of necessity, have been *out of military control.*

This Court has on several occasions discussed the implications found in the term *military control*, albeit in connection with an unauthorized absentee. In United States v Jackson, 1 USCMA 190, 193, 2 CMR 96 (1952), we said:

". . . If the absentee discloses his status so that the military authorities have full knowledge of all the facts, they could not, with propriety, contend that the absence was not legally terminated. Further, we think that if the authorities concerned could, by the use of reasonable diligence, obtain knowledge of the soldier's true status, the same result should obtain."

Cf. United States v Kitchen, 5 USCMA 541, 18 CMR 165 (1955).

In United States v Calpito, 18 USCMA 450, 40 CMR 162 (1969), where the accused's testimony in extenuation and mitigation revealed that his initial extensive efforts to return to his home station were frustrated by official error and inaction, we held that since this evidence was inconsistent with his plea of guilty to a charge of being absent without leave, his plea should have been rejected.

Physical presence at or on a military station is not the only manner in which an unauthorized absence may be terminated. As this Court stated in United States v Garner, 7 USCMA 578, 582, 23 CMR 42 (1957):

"Military control can be exercised directly by military personnel, or, for certain purposes, indirectly, by civilian officials acting for and on behalf of the Armed Forces, Reid v Covert, 341 US 487, 100 L Ed 1352, 76 S Ct 880 (1956), rehearing granted on another ground 352 US 813, 1 L Ed 2d 92, 77 S Ct 123."

In United States v Keaton, 18 USCMA 500, 40 CMR 212 (1969), the date of the accused's incarceration in a civilian facility, as a military ab-

sentee, established the beginning date for determining whether Keaton had been afforded a speedy trial.

The central point which must be borne in mind, with respect to the phrase "return to military ▮ control," is that from a ▮ legal standpoint it generally signifies the termination of an *unlawful* absence. If the absence is authorized, even though erroneously, military control is not lost, inasmuch as the serviceman is where he is authorized to be and remains amenable to military orders. United States v Bruhn, 4 CMR 407 (ABR 1952). An authorized absence does not become unauthorized simply because an accused, who had been informed that his leave had been granted, failed to comply with a local regulation requiring him physically to pick up his leave papers prior to departure. United States v Wheeler, 21 CMR 456 (ABR 1956).

In the case at bar, the parties stipulated that the accused was authorized to depart from Fort ▮ Hood, Texas, return to his home in Prescott, Arizona, and be available for a port call as of March 8, 1968. It was also stipulated that he was instructed that he would receive his port call at his home address. Since the accused remained at his home of record, the Army knew where he was at all times. There was no lack of opportunity for the Army to exercise control over him. Had his port call been sent to his home of record, as promised, the unrebutted testimony of the accused reflects that he was ready at all times to comply therewith. Clearly he was never out of military control and, therefore, could not be found guilty of dishonorable failure to return to military control. Cf. United States v Bruhn, supra.

This matter requires further comment, for this is a serious charge to be levied against an officer of the United States Army and it has been sustained through appellate review to this level.

Although the accused was specifically charged with dishonorable failure to return to military control, the case was prosecuted and affirmed on review on the theory that the accused was derelict in his duty.[2] Trial counsel, in his argument to the triers of fact, contended that the accused had a duty "to ascertain what had happened to his port call orders." The law officer seems to have agreed, as evidenced by his instructions on sentence.[3] He had previously stated, in an out-of-court hearing, that the specification alleged "a failure on the part of the accused to take positive steps to secure a port call. . . . Being an officer he had a duty to do something more than just sit and wait and that he neglected to do that duty." The staff judge advocate thought, and so informed the convening authority, that the offense was "closely related to AWOL for one year and could be punished accordingly." The Court of Military Review held that the alleged acts and omissions on the part of the accused "fell . . . below the 'limits of tolerance' regarding an officer's individual standards." (Paragraph 212, Manual for Courts-Martial, United States, 1969.) As that court stated:

". . . It is shocking to think that an officer could, in good conscience, wait at home for almost one year after the date of his availability date (8 March 1968),—after obtaining two months pay (on 1 March 1968) from a United States Air Force Base located about 100 miles from his home, and after ascertaining (on 9 March 1968) that his orders for shipment to Vietnam had been lost—with-

---

[2] "Art. 92. Failure to obey order or regulation.

"Any person subject to this chapter who—

. . . . .

(3) is derelict in the performance of his duties;

shall be punished as a court-martial may direct."

[3] Over objection of defense counsel, the law officer instructed the court that a violation of Article 134, Uniform Code of Military Justice, 10 USC § 934, was lesser included within the charged offense.

out making appropriate inquiries as to his military status."

However inappropriate or contrary to good conscience the accused's failure to make constant inquires into his status may have been, he cannot here stand convicted of dereliction of duty because that was not the dishonorable conduct alleged or proved. Nowhere in the record is there any evidence that the accused should have been in a place other than where he was; nor is there any evidence of an express duty to call and find out where else he should go. If the accused's failure to make a continuing inquiry into his status constitutes a criminal offense, he should have been charged with that offense. Since he was not, a presumption as to that dereliction may not be used to sustain some other unproved charge against him.

Offenses "sounding in unauthorized absence may be reached and penalized only under the provisions of Articles 85, 86, and 87," Code, supra, 10 USC §§ 885, 886, and 887 (United States v Deller, 3 USCMA 409, 413, 12 CMR 165 (1953)), and are not cognizable under Article 134, Code, supra. See also United States v Johnson, 3 USCMA 174, 11 CMR 174 (1953); United States v O'Neill, 3 USCMA 416, 12 CMR 172 (1953). The rationale of these cases is that the general articles, 133 and 134, cannot be used as catchalls to proscribe as criminal conduct activities which would be innocent if charged under any other article. Cf. United States v Sadinsky, 14 USCMA 563, 34 CMR 343 (1964).

In view of the action we take with regard to this case, we need not consider the second assigned issue.

The decision of the Court of Military Review is reversed. The record of trial is returned to the Judge Advocate General of the Army. The charge and its specification are ordered dismissed.

QUINN, Chief Judge (concurring in the result):

Stripped of unessential language, the specification alleges that on January 28, 1968, the accused was granted leave until March 11, 1968, and did not return to military control after the expiration of his leave until March 6, 1969. In my book, those allegations add up to unauthorized absence. United States v Myhre, 9 USCMA 32, 25 CMR 294 (1958). The description of the charge as a violation of Article 133, Uniform Code of Military Justice, 10 USC § 933, does not change its nature as a violation of Article 86, Code, supra, 10 USC § 886. See United States v Johnson, 3 USCMA 174, 178, 11 CMR 174 (1953).

As the principal opinion points out, the case was not tried as an unauthorized absence, instead it was prosecuted on the theory that the accused was authorized to remain at home until he received port call orders, but that when the orders did not arrive there came a time when the accused had a duty, as an officer and a gentleman, to report physically to some military organization. Thus, in his argument to the court members, trial counsel never contended that any part of the accused's absence was unauthorized; rather he referred to the accused's failure to seize "the initiative" as demonstrating a degree of "laxity" that seriously "compromis[ed] his duty as an officer and a gentleman." Similarly, in instructing the court members as to the elements of the offense, the law officer never mentioned the necessity for a finding that the accused had stayed away from the service without authority. As the case went to the court-martial, therefore, the question was whether, having been ordered to remain at home until he received further orders, the accused had a duty, after some reasonable time had passed without receipt of the stated orders, to report to a military unit.

Although I doubt that the failure of a superior commander to carry out his own orders imposes a duty upon a subordinate to act contrary to the orders given to him in a way that will correct the mistake or omission of his superior, I am willing to assume for the purposes of this case that such a

duty may arise. However, the specification does not allege that the accused failed to discharge a duty to return to a military unit. There is no averment, for example, that the accused had any such duty. See Manuals for Courts-Martial, United States, 1951, and 1969 (Revised edition), Appendix 6c, Form 30. Nor is there anything in the instruction on the elements of the offense to apprise the court members that they had to find the accused had such a duty by reason of the circumstances mentioned.

On this record, I am satisfied that the conviction cannot stand. If the specification purports to allege an unauthorized absence, which I believe it does, the instruction does not cover the elements of the offense. If the specification was intended to charge the violation of an independent duty on the part of the accused beyond the terms of the orders given him, the allegations are insufficient to allege that offense and the instructions do not adequately cover the elements of that offense. I, therefore, join in setting aside the findings of guilty and the sentence and in dismissal of the charge.

DARDEN, Judge (dissenting):

My basic disagreement with the principal opinion is in its tacit assumption that the same rules governing an absence without leave by an enlisted member should also determine whether an officer's conduct is unbecoming. It seems to suggest that because the specification in this case refers to a failure to return to military control, an offense under Article 133, Uniform Code of Military Justice, 10 USC § 933, should be tested as though it were an absence without leave or a dereliction of duty. If the appellant had been charged with an absence without leave or a dereliction of duty, the provisions of Article 86 or Article 92, Uniform Code of Military Justice, 10 USC §§ 886 and 892, and the cases construing those provisions would determine the validity of the conviction. But this Court has decided that the inclusion of a separate specific offense otherwise punishable under the Code, such as absence without

leave or dereliction of duty, is not a prerequisite to charging an officer under Article 133:

". . . [T]he essence of an Article 133 offense is not whether an accused officer's conduct otherwise amounts to an offense—although, of course, it may—but simply whether the acts meet the standard of conduct unbecoming an officer as spelled out. Manifestly this is so for, in the face of a well-defined and longstanding interpretation extant under the precursor statutes—particularly Article of War 95—Congress substantially reenacted the prior law as Article 133 of the Uniform Code, with the single exception of the punishment prescribed. . . . for, if only conduct otherwise recognized as criminal were embraced by Article 133, the enactment of that statute would be rendered wholly futile and meaningless. . . .

"Clearly, then, the appropriate standard for assessing criminality under Article 133 is whether the conduct or act charged is dishonorable and compromising as hereinbefore spelled out—this notwithstanding whether or not the act otherwise amounts to a crime." [United States v Giordano, 15 USCMA 163, 168, 35 CMR 135 (1964).]

On the point of whether the appellant was under military control, I can agree that he would have complied with orders to Vietnam if they had been received. As a result of the Army's error, though, he was beyond military control as effectively as if the Army did not know his whereabouts. For the purpose of an Article 133 violation, I do not agree that use of the words "military control" in the specification must cause the offense to be examined under the definition of absence without leave as this offense is defined in Article 86, Uniform Code of Military Justice. Perhaps an enlisted member in the circumstances of this case should not be charged with a military offense[1] but instead of taking ad-

---

[1] But an enlisted member has a continuing duty to inquire about his

vantage of mistakes by the Government, an officer has an obligation to attempt to correct them.

As I view this case, the appellant had no obligation to do anything other than to await further orders, until the expiration of a reasonable period of time after March 8, 1968. At some point after that date, surely earlier than one year, he reasonably should have suspected that a mechanical or human failure had resulted in his not having received orders to Vietnam.

An officer is expected to demonstrate initiative and a high sense of responsibility. During the nearly one year in which the appellant did nothing but wait (except for an early call to former associates, not officials with authority) he had to know that the United States was still sending forces to Vietnam. His failure to inquire about the reasons for the inordinate delay in his orders must have resulted in another officer's serving in Vietnam in his place. His inaction impresses me as being almost a classic example of conduct unbecoming an officer.

The severity of the sentence should not determine the outcome of a review for errors of law. I note, however, that the sentence here is to a dismissal, not to confinement or forfeitures. In my opinion, the punishment is fitting.

I would affirm the decision of the United States Army Court of Military Review.

status and is chargeable "with time lost" if he makes no good faith efforts to determine that status in a period following an authorized leave, after the purpose of that leave has been accomplished. Caraco v Resor, — F Supp — (DC DC) (1970).